# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

**LINEAR MOLD & ENGINEERING, LLC**

      **Debtor.**

Case No. 21-42617-mar
Chapter 11
Hon. Mark A. Randon

---

## DEBTOR'S FIRST DAY MOTION PURSUANT TO SECTIONS 105(a), 361, 362, 363, 364, AND 552 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(b) FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, AND (C) SCHEDULING A <u>FINAL HEARING ON THE MOTION</u>

Linear Mold & Engineering, LLC, and Debtor-in-Possession in the above captioned case ("Mold & Engineering" or "Debtor"), by and through its proposed attorneys, Strobl Sharp PLLC, files this motion ("Motion") for entry of an Order (the "Interim Order") (A) Authorizing the Debtor, Pursuant to Sections 105(a), 361, 362, 363, 364 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"), to use Cash Collateral, (B) Granting Adequate Protection, and (C) Scheduling a Final Hearing on this Motion (the "Final Hearing") in this case. In support of this Motion, the Debtor has submitted the Affidavit of John

Tenbusch ("Tenbusch") Debtor's Majority Member (the "Tenbusch Affidavit") as **Exhibit B**, and respectfully represents as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On March 26, 2021 (the "<u>Petition Date</u>") the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code.

2.      The Debtor has continued in possession of its property and has continued to operate its business as a Debtor-in-Possession pursuant to §§ 1107 (a) and 1108 of the Bankruptcy Code.

3.      The Court has not appointed the Subchapter V Trustee.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2).

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code, Bankruptcy Rule 4001(b) and Local Rule 4001-2.

## BACKGROUND OF THE DEBTOR

6.      Tenbusch originally incorporated Linear Mold & Engineering, Inc. ("Mold, Inc."), on May 23, 2003, as a full-service plastics mold tooling and production service provider. Tenbusch was the sole shareholder and Mold, Inc. started as a two-man operation with limited customers.

production service provider. Tenbusch was the sole shareholder and Mold, Inc. started as a two-man operation with limited customers.

7.     Over time, Mold, Inc. grew to 125 employees and approximately 300 varied customers. With full machine shop capabilities, Mold, Inc. become an industry leader in mold flow analysis, plastic injection mold simulation capabilities, full black-box design and advanced process support.

8.     Because of Mold, Inc.'s reputation as an industry leader, in 2015, Moog Inc. ("Moog"), a New York corporation and worldwide designer, manufacturer and integrator of precision control components and systems acquired 70% of the stock of Mold, Inc., with the objective of integrating into Mold, Inc.'s customer relationships, specifically its aerospace customer base. Tenbusch negotiated the sale of the remaining 30% of the Mold, Inc. stock and settled with Moog in January 2017.

9.     After Moog's acquisition of the Mold, Inc. stock, Tenbusch served as a vice-president and director of Moog and facilitated its integration into the Mold, Inc. customers. After a short period with Moog, Tenbusch resigned to pursue other opportunities.

10.     After 2 years of operation, Moog determined that it would transition the aerospace customers into Moog and divest itself of the Mold, Inc. operations.

11.     In June 2017, Tenbusch organized Linear Acquisition, LLC ("Acquisition") with the intent of re-purchasing the Mold, Inc. stock from Moog.

12.     After the re-purchase of the Mold, Inc., stock by Acquisition, Mold, Inc., was merged into Mold & Engineering.  Acquisition is the sole member of Mold & Engineering.

13.     On September 1, 2018, Mold & Engineering entered into a five (5) year lease for the property located at 12163 Globe Street, Livonia, Michigan (the "Globe Street Property").

14.     However, in order to effectively grow the molding operations, the Globe Street Property needed to supplement its power supply.  Unfortunately, over the course of nine (9) months Mold & Engineering was unable to adequately increase the power supply at the Globe Street Property and determined that the molding operations needed to be moved to a new location with sufficient power resources.

15.     Consequently, Mold & Engineering entered into a lease for the property located at 400 Parkland Drive, Charlotte, Michigan (the "Charlotte Property").  The molding operations were permanently relocated to the Charlotte Property.

16.     By June 2019, it was clear that revenue from the tooling operations had fallen sharply and would not recover in a reasonable timeframe.  The tooling operations were no longer profitable and were draining resources from other

4

profitable operations. Therefore, a decision was made to shut down the tooling operations and to focus on the plastics, injection molding and additive business.

17.     This left Mold & Engineering with substantial debt associated with the tooling business and no active tooling operations or ability to generate revenue associated with the tolling industry to satisfy that debt.

18.     In 2017, at the time Acquisition acquired the stock of Mold, Inc., from Moog, the company had approximately 91 employees. Mold & Engineering immediately began trimming the employee base to only those employees needed for continued operations. Currently, Mold & Engineering employs approximately twenty-eight (28) employees across its various business operations, including management, sales, engineering, account management, production, production management and human resources (collectively, the "Employees"). All production employees are located at the Charlotte Property.

19.     The management team is made up of Tenbusch and Louis Young ("Young"). The corporate offices are located in the Globe Street Property. Tenbusch is the Chief Executive Officer and the 96.5% member of Acquisition. Tenbusch has a background in design engineering for tooling and am involved in all aspects of operations, sales and production.

20.     Young, an industrial engineer, joined Mold, Inc., in 2003 when it was originally established. He stayed with the company throughout the time it was

5

under the ownership of Moog.  Young has remained with the Company as its President.  He holds a 3.5% interest in Acquisition.

## EVENTS LEADING TO THE BANKRUPTCY FILING

21.      A number of factors have contributed to the Debtor's decision to file for relief under Chapter 11, Subchapter V of the Bankruptcy Code.

22.      Prior to the onset of the pandemic, the Debtor has been losing money due to the excessive tooling debt and was maintaining operations through the infusion of capital by Tenbusch.  In September 2019 Level One offset a Charles Schwab cash collateral account pledged by Tenbusch in the amount of $2,189,951.78 in order to reduce Mold & Engineering's debt load.

23.      At the time of the offset, Mold & Engineering auctioned its equipment not needed to sustain the continuing molding operations.  The proceeds were used to further reduce the Bank debt.

24.      Continuing losses have been driven chiefly by a change in the structure of the auto industry and shifting demands for the services offered by Mold & Engineering.    Historical profit prior to the period of ownership by Moog were largely driven by customers in the aerospace industry, metal 3D printing and tooling customers.  With the loss of the aerospace customer base to Moog and loss attributable to the tooling business, Mold & Engineering has shifted its focus to metal 3D printing and plastic 3D printing services for the auto industry.  This has

6

helped supplement the loss of the tooling revenue but, has not generated sufficient cash flow to service the debt associated with the shutdown of the tooling business.

25.　　　In addition, the Debtor has recently been faced with costly litigation in the United States District Court for the Northern District of Illinois and in the state courts in Michigan. The litigation has had a drain on Debtor's personnel and financial resources.

26.　　　By early 2020, after having successfully shed the tooling business, Mold & Engineering was trending toward a positive cash flow – this despite continuing to carry the tooling debt. Unfortunately, COVID-19 hit the auto industry heavy in March 2020, wiping out the positive gains made by Mold & Engineering in late 2019 and 2020.

27.　　　The shutdown due to COVID-19 pursuant to Governor Whitmer's Executive Orders, had a significant negative impact on Mold & Engineering's operations and revenue. Orders and customer requirements deceased substantially at the outset of the shutdown due to reduced production and workflows. Mold & Engineering's revenue dropped by approximately 40% compared to 2019 revenue reduced by the revenue generated by the tooling operations.

28.　　　On April 15, 2020, Mold & Engineering received a loan under the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") in the amount of $554,100.00, which has been forgiven in full.

29.     In addition, Mold & Engineering submitted a request directly to the SBA for an Economic Injury and Disaster Loan. On August 31, 2020, the SBA issued a secured disaster loan to Mold & Engineering in the amount of $150,000 with an annual interest at the rate 3.75% (the "EIDL Loan"). Monthly payments in the amount of $731.00 on the EIDL Loan are scheduled to begin in August 2021. The SBA has recorded a blanket UCC Financing Statement with respect to the EIDL Loan.

30.     Mold & Engineering applied for and received a second PPP loan in the amount of $554,133.00 through Level One. The funds were disbursed on February 2, 2021. During the covered period, Mold & Engineering has potential forgiveness payments in the full amount of the funds received. The PPP Loan Forgiveness Application will be submitted seeking forgiveness of the entire loan amount. It is anticipated that the entire PPP loan will be forgiven.

31.     Since the resumption of production in the auto industry and the lifting of the shutdown orders, Mold and Engineering has experienced a recovery in its revenue. Assuming no additional shutdowns or production stoppages, it is anticipated Mold and Engineering's revenue will return to 2019 level, less the revenue generated by tooling operation, by mid-2021.

## THE PREPETITION SECURED CLAIMS

32.     In order to meet operational expenses, Mold & Engineering maintains a line of credit with Level One Bank ("Level One Bank" or "Bank") as follows:

> On July 17, 2017, Mold & Engineering executed a Promissory Note (Line of Credit-Prime), a Loan Agreement and two Security Agreements with respect specific equipment and all assets, in the principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in favor of Level One Bank (the "Mold & Engineering Note"). On November 1, 2018, Mold & Engineering executed an Allonge to the Promissory Note reducing the face amount of the Linear Note from Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) to Two Million and 00/100 Dollars ($2,000,000.00). In support of the Mold & Engineering Note, the John Tenbusch Revocable Trust, Young and Tenbusch executed a Continuing Guaranty.

("Level One Bank Debt")

33.     The approximate outstanding balance due on the Level One Bank Debt as of the Petition Date is $957,945.02, including principal and interest.

34.     October 11, 2019, Acquisition, Mold & Engineering, the John Tenbusch Revocable Trust, Young and Tenbusch entered into a Loan Affirmation and Restructure Agreement ("Forbearance Agreement") with the Bank in connection with the Level One Bank Debt. On April 2, 2020, an Amendment to Loan Affirmation and Restructure Agreement ("Amended Forbearance Agreement") was executed. The Forbearance Period under the Amended Forbearance Agreement expires on April 1, 2021.

## DEBTOR'S PREPETITION ASSETS

35.        As of the Petition Date, the Debtor's assets were chiefly made up

of (1) earned accounts receivable, (2) equipment and vehicles used in the operations

of Debtor's business, and (3) executory contracts and going concern value (good

will). The Debtor's estimate the fair market value of its assets on the Petition Date

as follows:

|   |   |   |
|---|---|---|
| i. Accounts Receivable: | | $ 1,117,198.34 |
| ii. Personal Property: | | $    271,225.00 |
| iii. Cash on Hand: | | $     176,801.26 |
| | Total: | $ 1,565,224.60 |

## USE OF CASH COLLATERAL AND
## ADEQUATE PROTECTION

36.        A potential disruption in services would be devastating to the

Debtor's ability perform on its contracts. Consequently, of <u>immediate</u> urgency is

the need to fund the Debtor's payroll, including the payroll due to employees due on

April 2, 2021, and to satisfy post-petition obligations owed to the Debtor's post-

petition creditors who will provide the goods and services needed by the Debtor to

perform on existing contracts.

37.        The Debtor proposes to use Cash Collateral for the payment of post-

petition employee wages and salaries, payroll taxes, supplies and other post-petition

general operating and working capital purposes, including amounts paid for such

10

purposes which may constitute administrative expense claims under the Bankruptcy Code directly attributable to the operation of Debtor's business post-petition as authorized by final order of the Court.

38.     The Debtor has delivered an initial 13-week projected budget to the Bank (the "Budget").  See **Exhibit C.**

39.     The Debtor has been in contact with counsel for the Bank regarding the use of Cash Collateral.  The Debtor and the Bank have negotiated for the consensual use of Cash Collateral.

40.     Debtor is proposing to provide adequate protection to the Bank and as follows:

(a)     Debtor will make monthly payments to the Bank in the amount of $13,600.00 beginning on April 25, 2021 and continuing on the 25th day of each consecutive month until the effective date of a confirmed of a plan of reorganization or conversion or dismissal of this case.

(b)     In addition, the Debtor shall grant the Bank replacement liens in Debtor's post-petition assets, effective as of the Petition Date, including, but not limited to, all accounts receivable, to the same extent, validity and in the same priority as such liens existed on the Petition Date, as well as a claim under Bankruptcy Code § 507(b) for any unpaid adequate protection payments as provided for hereunder.

11

(c)     Debtor shall have a five (5) business day grace period to make its adequate protection payments to the Bank. Upon the failure of the Debtor to cure such default within five (5) days of written notice, served on Debtor's counsel via email, Debtor's right to use Cash Collateral under the Interim and/or Final Order shall immediately cease upon the filing of an Affidavit of Default by the Bank and the Bank shall have the right to seek to lift the automatic stay on an expedited basis.

(d)     The Bank shall retain its first priority lien and the payment priorities as set forth herein, subject and subordinate to a carve out (the "Carve-Out), which shall be comprised of the following (i) all approved and unpaid fees to be paid to the Subchapter Trustee and (ii) the Debtor's unpaid professional fees directly associated with services provided to Debtor in this bankruptcy case, which have, a) been incurred post-petition, accrued post-petition and invoiced post-petition and, b) remain unpaid upon confirmation of a Chapter 11 Plan or a conversion of the Chapter 11 Case up to the aggregate amount of Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

41.     Based on the critical need to protect the Debtor's ability to perform on its executory service contracts thereby preserving the Debtor's estate, the Debtor

believes that it should be permitted to use the post-petition Cash Collateral to fund ongoing post-petition operations only.

42.        Debtor is proposing to provide the SBA whose lien was fixed on the Petition Date, adequate protection payments as outlined in the EIDL Loan scheduled to begin August, 2021. The SBA shall be granted a post-petition continuing lien in the post-petition assets in the same priority and to the same extent as such existed on the Petition Date.

## RELIEF REQUESTED

43.        By this Motion, Debtor seeks an order pursuant to sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code: (a) authorizing use of Cash Collateral pursuant to the terms of the Interim Order; (b) granting and affirming to the extent necessary, the adequate protection given to Level One Bank and the SBA in respect of their interest in the Pre-Petition Collateral, and (c) scheduling the Final Hearing on this Motion.

44.        Bankruptcy Rule 4001(d) provides that the court may fix the time within which objections to the approval of an agreement relating to cash collateral and adequate protection pursuant to Section 363 of the Bankruptcy Code must be filed. In addition, the Court is empowered to conduct an expedited preliminary hearing on the Motion and authorize the use of the Operating Cash to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

## BASIS FOR RELIEF

45.     The Debtor will continue to need the use of the Cash Collateral to pay immediate post-petition expenditures, consistent with the proposed Budget, to maintain its ability to service customers and to continue operations for the benefit of creditors. These expenditures will enable the Debtor to continue operating post-petition, immediately fund the Debtor's payroll and preserve the Pre-Petition Collateral. Without the authority to use Cash Collateral, the Debtor will not have working capital needed to operate, pay employees, or maintain operations post-petition to protect the bankruptcy estate.

46.     Pursuant to Sections 363(c)(2) and 363(e) of the Bankruptcy Code, the Debtor is permitted to use the Cash Collateral as the Debtor is providing the pre-petition secured creditor with adequate protection. "Adequate protection" is not defined in the Bankruptcy Code, although 11 U.S.C. § 361 sets forth three (3) non-exclusive methods of how an interest in property may be adequately protected. *In re Shriver*, 33 B.R. 176, 186 (Bankr. N.D. Ohio 1983).

47.     Adequate protection is aptly described as "a balancing of the debtor's and a creditor's respective harm." *In re Carson,* 34 B.R. 502, 505 (Bankr. D. Kan. 1983) (citation omitted). The legislative history of Section 361 of the Bankruptcy Code reflects Congress' intent to give the Court flexibility to fashion adequate protection in light of the facts and equitable considerations in each case.

14

*E.g., In re O'Connor*, 808 F.2d 1393, 396-97 (10th Cir. 1987); *In re 5-Leaf Clover Corp.*, 6 B.R. 463, 466 (Bankr. S.D. W. Va. 1980); *see also In re Harrington & Richardson, Inc.*, 48 B.R. 431, 433 (Bankr. D. Mass. 1985) (noting that adequate protection is "a flexible concept which requires a Court to make decisions on a case-by-case basis."). For example, in determining what constitutes "adequate protection," courts must consider not only the interests of the secured creditor whose cash collateral is affected, but the interests of all other creditors in light of the debtor's efforts to enhance the prospects of reorganization. *O'Connor*, 808 F.2d at 1397-98.

48. To say that a secured creditor is entitled to adequate protection means that the secured creditor is entitled to assurance that the value of its lien will not decrease as a result of the automatic stay and if it does, that it will receive something as compensation for the decrease. *In re Ramco Well Service, Inc.*, 32 B.R. 525, 531 (Bankr. W.D. Okla. 1983).

49. Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 15-day period following the filing of a motion requesting authorization to use cash collateral, "only . . .as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business

decisions. *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 449 (D. Co. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bank S.D. N.Y. 1990).

50.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). To use cash collateral without the lienholder's consent and to use other property in which a creditor claims an interest, the debtor is required to provide the lienholder with adequate protection of its interest in the cash collateral and other property in which an interest is claimed. The term "adequate protection" is defined in Section 361 of the Bankruptcy Code. Adequate protection may be provided by granting a lienholder an additional or replacement lien to the extent that the stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property. 11 U.S.C. § 361(2).

51.     Adequate protection must be determined on a case-by-case basis, in light of the particular facts and circumstances presented, the focus being that which is required to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *In re Ledgmere Land Corp.,* 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *Delbridge v. Production Credit Assoc. and Federal Land Bank,* 104 B.R. 824, 827 (E.D. Mich. 1989); *In re Kain.*

86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

52.     The Debtor is willing to grant Level One Bank and the SBA replacement liens in the Debtor's post-petition assets, in the same dollar amount and priority, as the value of its liens in the Cash Collateral and to make the proposed monthly adequate protection payments. Such replacement liens and payments constitute adequate protection in accordance with Section 361 of the Bankruptcy Code.

53.     The entry of the Interim Order will enable the Debtor to use its cash collateral and fund the Debtor's immediate post-petition needs (including the funding of the Debtor's payroll), as well as other post-petition needs of this case as the Debtor's endeavor to achieve the benefits of a meaningful and successful Chapter 11 reorganization.

54.     Conversely, immediate irreparable harm will occur to the Debtor, its customers, employees, creditors and its estate if the Debtor is not permitted to use Cash Collateral. In the absence of a court order authorizing the use of the Cash Collateral, the Debtor will not be unable to meet post-petition payroll and other operating expenses and will be forced to cease operations immediately, rather than continuing efforts to maximize value of its assets for the benefit of its estate and creditors. Thus, an inability to use Cash Collateral would cause a substantial and

17

immediate harm to the detriment of all of the Debtor's creditors and customers. *In re Marion Street Partnership,* 108 B.R. 218 (Bankr. D. Minn. 1989) (debtor was authorized to use cash collateral to pay operating expenses where the debtor could not operate for even one day without the use of cash collateral).

55.     Accordingly, the Debtor respectfully submits that the use of the Cash Collateral on the terms set forth in the Interim Order is in the best interest of the Debtor, its customers, estate, creditors and all parties in interest.

## REQUEST FOR FINAL HEARING

56.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor requests the Court set a date for the Final Hearing.

## WAIVER OF MEMORANDUM OF LAW REQUESTED

57.     As this motion raises no novel issues of fact or law and the legal basis relied upon by the Debtor has been adequately set forth herein, the Debtor request that the requirement of a separate memorandum of law be waived.

## NOTICE

58.     Notice of this Motion has been given by email, facsimile and/or overnight mail delivery to (a) the United States Trustee for the Eastern District of Michigan, (b) the Subchapter V Trustee, (c) counsel for Level One Bank, (d) Level One Bank, Attn: Jacob Hachey, (e) the U.S. Small Business Administration and (f) the twenty largest unsecured creditors in each Debtor's estate pursuant to Local Rule

4001-2(d)(l). Given the urgency of funding payroll (which must be funded by March 31, 2021) and the need for an immediate hearing, the Debtor submits that no other or further notice is necessary at this time.

59.     Pursuant to Local Rule 4001-2(c)(4) the Debtor shall serve the following parties with a copy of this motion and notice of the interim hearing date: (i) the United States Trustee for the Eastern District of Michigan; (ii) the Subchapter V Trustee (iii) counsel for Level One Bank; (iv) Level One Bank, Attn: Jacob Hachey; (v) the Small Business Administration; (vi) parties included on the Debtor's lists of twenty (20) largest unsecured creditors; and (vii) those parties that have requested notice pursuant to Bankruptcy Rule 2002 with notice of this motion.

**WHEREFORE**, the Debtor respectfully requests the Court grant the relief requested in this Motion and grant such other and further relief as is just and proper.

Respectfully submitted,

**STROBL SHARP PLLC**

_____/s/ Lynn M. Brimer_____
LYNN M. BRIMER (P43291)
PAMELA RITTER (P47886)
300 E. Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
(248) 540-2300; fax (248) 645-2690
lbrimer@stroblpc.com
pritter@stroblpc.com
Proposed Attorneys for Debtor and
Debtor in Possession

Date:  March 26_, 2021
*S&B\85363\001\PLDG\SB725916.DOCX

19

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

In re:

| | |
|---|---|
| **LINEAR MOLD & ENGINEERING, LLC,** | **Case No.: 21-42617-mar** <br> **Chapter 11** |
| **Debtor.** | **Hon. Mark A. Randon** |

**INTERIM ORDER
(A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING
ADEQUATE PROTECTION, AND (C) SCHEDULING
A FINAL HEARING ON THE MOTION**

Upon consideration of the Debtor's Motion for Entry of an Interim Order (the "Interim Order") (A) Authorizing the Debtor, Pursuant to Sections 105(a), 361, 362, 363, 364 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"), to use Cash Collateral, (B) Granting Adequate Protection, and (C) Scheduling a Final Hearing on the Motion (the "Final Hearing") (the "Motion"), as more fully described in the Motion; and upon consideration of the Affidavit of John Tenbusch, Authorized Member of the Debtor (the "Tenbusch

Affidavit"); and the Court having jurisdiction pursuant to sections 157 and 1334 of title 28 of the United States Code to consider the Motion and the relief requested therein; and venue being proper in this Court pursuant to sections 1408 and 1409 of title 28 of the United States Code; and it appearing that no other or further notice need be provided; and the Court having determined that entry of this Order is in the best interest of the Debtor in this matter, its estate, its creditors, and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion and attested to in the Tenbusch Affidavit establish just cause for the relief granted herein, it is therefore,

**THE COURT HEREBY FINDS:**

A.    On March 25, 2021 (the "Petition Date"), Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its business and to manage its assets as Debtor-in-Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    The Debtor has continued to operate its business as Debtor-in-Possession pursuant to §§ 1107 (a) and 1108 of the Bankruptcy Code.

C.    The Debtor requires the use of the Cash Collateral as defined in the Motion, for the post-petition operation of its business, and for payment of post-petition expenses attendant thereto.

2

D.     The relief requested in the Motion, and authorization for the use of Cash Collateral in the amounts shown in the budget attached to the Motion as Exhibit C (the "Budget"), are necessary, essential and appropriate for the continued post-petition operation of the Debtor's business and are otherwise necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing on the Motion.

E.     Pursuant to Local Rule 4001-2(c)(4) the Debtor has served (i) the United States Trustee for the Eastern District of Michigan; (ii) the Subchapter V Trustee; (iii) counsel for Level One Bank; (iv) Level One Bank, Attn: Jacob Hachey; (v) U.S. Small Business Administration ("SBA"); (vi) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; and (vii) those parties that have requested notice pursuant to Bankruptcy Rule 2002 with notice of this motion.

F.     Level One Bank ("Level One") has approved  the entry of this Interim Order.

G.     On the basis of the above and foregoing, it is in the best interests of the Debtor's estate and its creditors that the Debtor be authorized to use the Cash Collateral subject to and on the terms and conditions of this Interim Order.

H.     The Court has jurisdiction over this Case and the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This Interim Order is entered in a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(M).

3

In light of the foregoing,

**IT IS HEREBY ORDERED BY THE COURT** as follows:

1.     The Motion is granted.

2.     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Motion.

3.     *Authorization to Use Cash Collateral.* The Debtor is hereby authorized to use Cash Collateral subject to the terms of this Interim Order. The Debtor may use Cash Collateral for necessary post-petition operating expenses and in the amounts described in the budget attached to the Motion as <u>Exhibit C</u>, as may be modified, supplemented, or extended from time to time upon the written agreement of the Debtor and Level One (or as so modified, supplemented or extended) (the "<u>Budget</u>"). Debtor shall provide Level One a proposed updated budget each month along with an accounting, on a cash basis, of the Debtor's revenue, expenses and use of cash. Cash Collateral shall not be used for any other purpose or in any amounts in excess of the amounts described in the Budget without the prior written consent of the Level One. The Debtor is authorized to use Cash Collateral only to pay necessary post-petition operating expenses, which include, but are not limited to, post-petition: employee wages and salaries, payroll taxes, supplies, supplies and materials, insurance premiums, necessary maintenance, utilities, equipment lease payments, attorney and accounting fees and other general operating and working

capital purposes in the ordinary course of Debtor's post-petition operation of the business, including fees required by 28 U.S.C. §1930. This Order does not authorize the Debtor to pay any pre-petition debt.

    4.   *Adequate Protection.*

    a. *Replacement Liens:* In addition to their existing security interests and liens, Level One, and SBA, are granted a continuing replacement security interest and lien in the post-petition assets of the Debtor, including accounts receivable, in the same extent, validity and priority as they existed on the Petition Date to the extent of the diminution of collateral caused by Debtor's use of cash collateral, effective *nunc pro tunc,* as of the Petition Date as well as a claim under Bankruptcy Code § 507(b) for any unpaid adequate protection payments provided herein. Other than interests granted to Level One in its various security instruments, no liens are granted to Level One, and the SBA in any Chapter 5 causes of action or their proceeds. The automatic stay under Section 362(a) of the Bankruptcy Code is modified to the extent necessary to implement the terms of this Order.

    b. *Financial Information*: The Debtor shall supply financial information and information relating to the collateral as is reasonably required by Level One. In the event that Level One and the Debtor cannot agree as to what report(s) shall be provided, the Court shall, upon notice and a hearing, make

a determination. The Debtor shall provide to Level One Bank, A) on a monthly basis: (i) accounts receivable aging; (ii) profit and loss statements; and (iii) payables aging; and B) such other reports and documents as are required to be filed with the Office of the United States Trustee; and C) proof of timely payment of taxes and insurance payments.

c. *Adequate Protection Payments*: The Debtor shall make the following adequate protection payments to the Pre-petition Secured Creditors:

    i. In connection with the outstanding balance due Level One Bank, Level One Bank shall receive adequate protection payments in the amount of $13,600.00 beginning on April 1, 2021 and continuing on the 1st day of each consecutive month until the effective date of a confirmed of a plan of reorganization or conversion or dismissal of this case;

    ii. In connection with the outstanding balance due the SBA for the Economic Injury and Disaster Loan dated August 31, 2020, the SBA will receive adequate protection payments in the amount of $731.00 each month when they become due in August 2021;

    iii. Debtor shall have a five (5) business day grace period to make the adequate protection payments to Level One. Upon the failure of the Debtor to cure such default within five (5) business

days of written notice from Level One served on Debtor's counsel via e-mail, Level One shall be entitled to file an expedited motion to lift stay as set forth in paragraph 7 herein.

iv. Debtor shall at all times maintain such insurance on the Level One's Collateral, and all other tangible personal property as is required under its Security Agreements with Level One and as required by the US Trustee's operating instructions.

v. Subject to the terms and conditions contained in this Order and Level One's claims which have the lien and payment priorities as set forth herein, in any event, in all cases be subject and subordinate to a carve out (the "Carve-Out), which shall be comprised of the following (i) all fees, approved and unpaid, to the Subchapter V Trustee and (ii) the amount of the Debtor's unpaid professional fees which have, a) been incurred post-petition, accrued post-petition, and invoiced post-petition and, b) remain unpaid upon confirmation of a Chapter 11, Subchapter V Plan or a conversion of a Chapter 11, Subchapter V Case up to the aggregate amount of Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

5.    *Non-Payment Events of Default*:  Any of the following shall constitute an "Event of Default" hereunder:

a.    Debtor violates or fails to timely satisfy, post-petition, any non-payment term or condition of this Consent Order.

b.    Debtor's Chapter 11, Subchapter V proceeding is converted to a Chapter 7 proceeding or dismissed.

c.    Debtor's business operations materially change.

d.    Insurance as required hereunder is deemed inadequate, is allowed to lapse by the Debtor, or is otherwise terminated.

6.    *Remedies upon an Event of a Non-Payment Default*:    Upon the occurrence of a post-petition Event of Default, Level One Bank, and the SBA shall have the right to notify the Debtor's counsel of such Event of Default via e-mail and Debtor shall have five (5) business days from the date of such notice to fully cure the Event of Default.   In the event that Debtor fails to timely cure such Event of Default, Debtor's right to use Cash Collateral shall immediately terminate and Level One may file with the Court, on an *ex parte* basis, an affidavit regarding Debtor's uncured Event of Default and submit a proposed order prohibiting further use of Cash Collateral, and may file a motion to lift the automatic stay on an expedited basis seeking the termination of the automatic stay with respect to their respective collateral.

8

7.    *Remedies upon an Event of a Payment Default*: In the event the Debtor fails to make any of the adequate protection payments as set forth in this Order, Level One and the SBA shall provide notice thereof to counsel for the Debtor as set forth herein. Upon the failure of the Debtor to cure such default within five (5) days of notice, Level One and the SBA shall have the right to seek to lift the stay on an expedited basis.

8. *Notice:* Within 24 hours of the entry of this Interim Order, the Debtor shall serve by first class U.S. mail, postage prepaid, a copy of the Motion and this Interim Order upon the following: (i) the Office of the United States Trustee for the Eastern District of Michigan; (ii) Subchapter V Trustee; (iii) counsel for Level One Bank; (iv) Level One Bank, Attn: Jacob Hachey; (v) U.S. Small Business Administration (vi) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; and (vii) those parties that have requested notice pursuant to Bankruptcy Rule 2002.

9. The deadline to file an objection to this Interim Order is fourteen (14) days from the entry of this Order. If an objection is timely filed, the final hearing will be held. If no objection is timely filed, the interim or preliminary order may become a final order. Any objection to the continued effectiveness of this Interim Order or to a final order under similar terms to those terms set forth herein shall be in writing and shall be filed with the Court and served on each of the follow persons or entities:

(a)     Counsel for the Debtor: Strobl Sharp, PLLC, 300 E. Long Lake Rd., Suite 200, Bloomfield Hills, MI 48304. Attention: Lynn Brimer;

(b)     Subchapter V Trustee;

(c)     Counsel for Level One Bank, Attn: Frances Belzer Wilson, Esq., Dawda, Mann, Mulcahy & Sadler, PLC, 39533 Woodward Ave., Suite 200, Bloomfield Hills, MI 48304;

(d)     Level One Bank, Attn: Jacob Hachey, 32991 Hamilton Court, Farmington Hills, MI 48334;

(e)     Office of the United States Trustee, 211 W. Fort Street, Suite 700, Detroit, Michigan 48226.

(f)     U.S. Small Business Administration, SBA Disaster Loan Service Center, 2 North 20th Street Suite 320, Birmingham AL 35203

10.     *Final Hearing*.  A final hearing on the Motion will be held on the _____ day of _____, 2021 at:_____ a.m., as the same may be continued or adjourned by the Bankruptcy Court.

This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Interim Order.

**EXHIBIT B**

**<u>TENBUSCH AFFIDAVIT</u>**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

**LINEAR MOLD & ENGINEERING, LLC,**

      **Debtor.**

Case No.: 21-42617-mar
**Chapter 11**

Hon. Mark A. Randon

---

## AFFIDAVIT OF JOHN TENBUSCH
## <u>AS MAJORITY MEMBER OF THE DEBTOR</u>

**STATE OF MICHIGAN**     )
                               ) SS
**COUNTY OF WAYNE**       )

John Tenbusch, being duly sworn, deposes and says:

1.      I am the 96.5% member in Linear Acquisition, LLC ("Acquisition"), which is the sole member of Linear Mold & Engineering, LLC d/b/a Linear AMS ("Mold & Engineering" or "Debtor"). I serve as the Chief Executive Officer of Mold & Engineering. In my capacity as the majority member of Acquisition and CEO of Mold & Engineering, I am familiar with the day-to-day operations, business affairs, corporate structure and books and records of the Debtor. I am authorized to submit this affidavit (the "Affidavit") on behalf of the Debtor.

2. I make this Affidavit to assist the Court and other parties in understanding the circumstances that compelled the Debtor to file its Chapter 11 proceeding, and the following first day motions:

    a. Motion Pursuant to Sections 105(a), 361, 362, 363, 364, and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral; (B) Granting Adequate Protection; and (C) Scheduling a Final Hearing on the Motion;

    b. First Day Motion for Authorization (A) to Pay Pre-Petition Wages, Salaries, Benefits, and Reimbursable Expenses, and to Continue Existing Employee Policies, and (B) to Continue in Effect Workers' Compensation Programs;

    c. First Day Motion for Order Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services Pending Determination of Adequate Assurance of Payment for Future Utility Services, and Approving the Proposed Adequate Assurance Procedures Under Section 366 of the Bankruptcy Code.

3. The Debtor is operating its business and managing its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, information supplied to me by other employees of the Debtor and/or professionals retained by the Debtor, is information I learned through review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I

were called upon to testify, I could and would testify competently to the facts set forth herein.

## **GENERAL BACKGROUND**

5.    Mold & Engineering commenced this voluntary case under Chapter 11, Subchapter V, of the Bankruptcy Code on March 25, 2021 (the "Petition Date"). The Debtor is authorized to continue to operate its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    The Subchapter V Trustee has not been appointed.

7.    I originally incorporated the predecessor to the Debtor, Linear Mold & Engineering, Inc. ("Mold, Inc."), on May 23, 2003, as a full-service plastics mold, tooling and production service provider. I was the sole shareholder and Mold, Inc. started as a two-man operation with limited customers.

8.    Over time, Mold, Inc. grew to 125 employees with approximately 300 varied customers. With full machine shop capabilities, Mold, Inc. become an industry leader in mold flow analysis, plastic injection mold simulation capabilities, full black-box design and advanced process support.

9.    Because of Mold, Inc.'s reputation as an industry leader, in 2015, Moog Inc. ("Moog"), a New York corporation and worldwide designer, manufacturer and integrator of precision control components and systems, acquired 70% of the stock of Mold, Inc., with the objective of integrating into

SB733840.DOC

acquired 70% of the stock of Mold, Inc., with the objective of integrating into Mold, Inc.'s customer relationships, specifically its aerospace customer base. I negotiated the sale of the remaining 30% of the Mold, Inc. stock and settled with Moog in January 2017.

10.     After Moog's acquisition of the Mold, Inc. stock, I served as a vice-president and director of Moog and facilitated its integration into the Mold, Inc. customers. After a short period with Moog, I resigned to pursue other opportunities.

11.     After 2 years of operation, Moog determined that it would divest itself of the Mold, Inc. operations and transition the aerospace customers into Moog.

12.     In June 2017, I organized Acquisition, with the intent of re-purchasing the Mold, Inc. stock from Moog. Contemporaneously, Linear Realty, LLC was formed as a single member limited liability company, with Acquisition as its sole member, in order to purchase the real estate located at 12926 Stark Road, Livonia, Michigan 48150 (the "Stark Road Property").

13.     After the re-purchase of the Mold, Inc., stock by Acquisition, Mold, Inc., was merged into Mold & Engineering. Acquisition is the sole member of Mold & Engineering and Realty.

14.     At the time, the Mold & Engineering operations were housed in three buildings – two leased locations and the Stark Road Property. In order to

SB733840.DOC

consolidate operations, grow the business, expand revenue and improve profitability, on September 29, 2018, Realty purchased the property located at 12163 Globe Street, Livonia, Michigan (the "Globe Street Property"). On September 1, 2018, Mold & Engineering entered into a five (5) year lease with Realty for the Globe Street Property and consolidated all operations in one location.

15. However, in order to effectively grow the molding operations, the Globe Street Property needed to supplement its power supply. Unfortunately, over the course of nine (9) months Mold & Engineering was unable to adequately increase the power supply at the Globe Street Property and determined that the molding operations needed to be moved to a new location with sufficient power resources.

16. Consequently, Mold & Engineering entered into a lease on May 7, 2019 for the property located at 400 Parkland Drive, Charlotte, Michigan (the "Charlotte Property"). The molding operations were permanently relocated to the Charlotte Property.

17. By June 2019, it became clear that revenue from the tooling operations had fallen sharply and would not recover in a reasonable timeframe. The tooling operations were no longer profitable and were draining resources from other profitable operations. Therefore, a decision was made to shut down the

tooling operations and to focus on the plastics, injection molding and additive business.

18. This left Mold & Engineering with substantial debt associated with the tooling business and no active tooling operations or ability to generate revenue associated with the tolling industry to satisfy that debt.

## CURRENT EMPLOYEES AND MANAGEMENT TEAM

19. In 2017, at the time Acquisition acquired the stock of Mold, Inc., from Moog, the company had approximately 91 employees. Mold & Engineering immediately began trimming the employee base to only those employees needed for continued operations. Currently, Mold & Engineering employs approximately twenty-eight (28) employees across its various business operations, including management, sales, engineering, account management, production, production management and human resources (collectively, the "Employees"). All production employees are located at the Charlotte Property.

20. The management team is made up of myself and Louis Young ("Young"). Our offices are located in the Globe Street Property. I am the Chief Executive Officer and the 96.5% member of Acquisition. I have a background in design engineering for tooling and am involved in all aspects of operations, sales and production.

21. Young, an industrial engineer, joined Mold, Inc., in 2003 when it was originally established. He stayed with the company throughout the time it was under the ownership of Moog. In 2017 when Moog determined that it wanted to divest itself of the Mold, Inc. operations, Moog approached Young to assist in the process. Young approached me regarding the divestiture and together we acquired the Mold, Inc., stock through Acquisition. Young has remained with Mold & Engineering as its President. Young holds a 3.5% interest in Acquisition.

## THE PREPETITION SECURED CLAIMS

22. In order to meet operational expenses, Mold & Engineering maintains a line of credit with the Level One Bank (the "Bank" or "Level One") as follows:

> On July 17, 2017, Mold & Engineering executed a Promissory Note (Line of Credit-Prime), a Loan Agreement and two Security Agreements with respect specific equipment and all assets, in the principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in favor of Level One Bank (the "Mold & Engineering Note"). On November 1, 2018, Mold & Engineering executed an Allonge to the Promissory Note reducing the face amount of the Linear Note from Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) to Two Million and 00/100 Dollars ($2,000,000.00). In support of the Mold & Engineering Note, the John Tenbusch Revocable Trust, Young and I executed a Continuing Guaranty.

(the "Mold & Engineering Note")

23. The approximate outstanding balance due on the Mold & Engineering Note as of the Petition Date is $957,945.02.

SB733840.DOC

24.     In August of 2018, Realty entered into a series of loan agreements

with the Bank, including a term loan and non-revolving line of credit, including a

Swap Agreement with the Bank of Montreal, secured by a mortgage on the Globe

Street Property (collectively, the "Realty Loans") as follows:

> a.  On August 2, 2018, Realty executed a Promissory Note (Term
>     Loan), a Loan Agreement, Mortgage and Assignment of Rents with
>     respect to property located at 12163 Globe Street, Livonia,
>     Michigan 48150 in the principal amount of One Million Six
>     Hundred Fifty Thousand and 00/100 Dollars ($1,650,000.00)
>     ("Realty Note #1"). In support of the Realty Note #1, Acquisition,
>     Mold & Engineering, the John Tenbusch Revocable Trust, Young
>     and I executed a Continuing Guaranty.
>
> b.  On August 2, 2018, Realty executed a Promissory Note (Line of
>     Credit) which reflected an assumption of Mold & Engineering
>     Debt and was subsequently Amended and Restated to a Non-
>     Revolving Line of Credit, a Loan Agreement, Mortgage and
>     Assignment of Rents with respect to property located at 12163
>     Globe Street, Livonia, Michigan 48150 in the principal amount of
>     One Million Three Hundred and Twenty Thousand and 00/100
>     Dollars ($1,320,000.00) ("Realty Note #2"). In support of the
>     Realty Note #2, Acquisition, Mold & Engineering, the John
>     Tenbusch Revocable Trust, Young and I executed a Continuing
>     Guaranty. (collectively, Realty Note #1 and Realty Note #2 shall
>     be referred to as the "Realty Debt")

25.     Mold & Engineering guaranteed the Realty Debt.

26.     In connection with tenant improvements for its benefit, Mold &

Engineering entered into three equipment finance agreements for the purchase and

installation of solar panels and related equipment at the Globe Street Property as

follows:

SB733840.DOC

a. An Equipment Finance Agreement with Ascentium Capital, LLC (230652), dated August 21, 2018, with respect to specific equipment: Solar Panels, Electrical upgrades in the amount of One Hundred Sixty-Five Thousand and 00/100 Dollars ($165,000.00). I have personally guaranteed this Equipment Finance Agreement along with Young;

b. An Equipment Finance Agreement with Ascentium Capital, LLC (230695), dated August 21, 2018, with respect to specific equipment: Solar Panels, Electrical upgrades in the amount of One Hundred Fifteen Thousand and 00/100 Dollars ($115,000.00). I have personally guaranteed this Equipment Finance Agreement along with Young; and

c. An Equipment Finance Agreement with Ascentium Capital, LLC (232862), dated August 21, 2018, with respect to specific equipment: LED Lighting, HVAC, Insulation, Roofing, Efficient Doors & Windows in the amount of One Hundred Fifteen Thousand and 00/100 Dollars ($115,000.00). I have personally guaranteed this Equipment Finance Agreement along with Young.

(collectively the "Ascentium Capital Debt")

27.    October 11, 2019, Acquisition, Realty, Mold & Engineering, the John Tenbusch Revocable Trust, Young and I entered into a Loan Affirmation and Restructure Agreement ("Forbearance Agreement") with the Bank in connection with the Level One Bank Debt.    On April 2, 2020, an Amendment to Loan Affirmation and Restructure Agreement ("Amended Forbearance Agreement") was executed.    The Forbearance Period under the Amended Forbearance Agreement expires on April 1, 2021.

28.    Prior to the Petition Date, Realty closed on the sale of the Globe Street Property, paid the Realty Debt and Ascentium Capital Debt in full.

29. Debtor negotiated a Lease Agreement with the Purchaser of the Globe Street Property on favorable rental terms. Under the terms of the Lease Agreement, Debtor is responsible for the collection and remittance of the aggregate base rent on behalf of itself and the other Globe Street Property tenants. Debtor is also obligated to collect and pay the Globe Street Property expenses on behalf of itself and the other building tenants.

30. In order to grow its business, beginning in about July 2018, Mold & Engineering entered into a series of leases titled as equipment financing agreements to lease the necessary machinery and equipment to expand the 3D metal printing, 3D plastic printing and additive business as follows:

    a. An Equipment Finance Agreement with Complete Capital Services, Inc., July 17, 2018, and assigned to People's Capital Leasing Corp. with respect to specific equipment: 1-TruMark Station 5000 Work Station including all accessories and/or options in the original amount of One Hundred Thirty-Four Seven Hundred and Two and 00/100 Dollars ($134,702.00).

    b. An Equipment Finance Agreement with Complete Capital Services, Inc., September 18, 2018, with respect to specific equipment: 1-EOSINT M280 with 400W Machines including all accessories and/or options in the original amount of Three Hundred Eighty-Eight Thousand and Ninety-Nine and 50/100 Dollars ($388,099.50).

    c. An Equipment Finance Agreement with Midland States Bank dated September 18, 2018, with respect to specific equipment: 1-EOSINT M280 3D Printer including all accessories and/or options in the original amount of Three Hundred Eighty-Eight Thousand and Ninety-Nine and 50/100 Dollars ($388,099.50).

d. An Equipment Finance Agreement with Complete Capital Services, Inc., dated November 16, 2018, which was assigned to Bank of the West with respect to specific equipment: 1 HP Jet Fusion 3D 4210 Printer including all accessories and/or options in the original amount of Three Hundred Fifty Nine Thousand Two Hundred Eleven and 00/100 Dollars ($359,211.00).

e. An Installment Payment Agreement with CIT Bank, N.A., dated November 19, 2018, with respect to specific equipment: Jet Fusion Equipment in the original amount of Ninety-Nine Thousand Seven Hundred and 00/100 Dollars ($99,700.00).

f. An Equipment Finance Agreement with Renaissance Capital Alliance, LLC, November 28, 2018, with respect to specific equipment: Caterpillar Lift Truck Model 2C6000 S/N AT83F42824 together with all attachments and accessories thereto in the original amount of Thirty-Three Thousand Two Hundred Forty-Six and 63/100 ($33,246.63).

g. An Equipment Finance Agreement with Highland Capital Corporation, November 16, 2018, with respect to specific equipment: 1 HP Jet Fusion 3D 4210 Printer including all accessories and/or options in the amount of Three Hundred Ninety-Seven Thousand Seven Hundred and Seventy-Two and 00/100 Dollars ($397,772.00).

(collectively the "Equipment Financing Agreements")

## DEBTOR'S PREPETITION ASSETS

31. As of the Petition Date, the Debtor's assets were chiefly made up of (1) earned accounts receivable, (2) equipment and vehicles used in the operations of Debtor's business, and (3) executory contracts and going concern value (good will). The Debtor estimates the fair market value of its assets on the Petition Date as follows:

| | | |
|---|---|---|
| Accounts Receivable: | | $ 1,117,198.34 |
| Personal Property: | | $ 271,225.00 |
| Cash on Hand: | | $ 176,801.26 |
| | Total: | $ 1,565,224.60 |

## EVENTS LEADING TO THE BANKRUPTCY FILING

32. A number of factors have contributed to the Debtor's decision to file for relief under Chapter 11, Subchapter V of the Bankruptcy Code.

33. For some period of time, the Debtor has been losing money on an annual basis and has maintained operations in part through my infusion of capital into the company. For example, in September 2019 Level One offset a Charles Schwab cash collateral account in the amount of $2,189,951.78 I had pledged as part of my personal guarantee in order to reduce Mold & Engineering's debt load.

34. At the time of the offset, Mold & Engineering auctioned its equipment not needed to sustain the continuing mold making operations. The auction proceeds further reduced the Bank debt.

35. Mold & Engineering's losses were driven chiefly by a change in the structure of the auto industry and shifting demands for the services offered by Mold & Engineering. Historical profits prior to the ownership by Moog were largely driven by customers in the aerospace industry, metal 3D printing and tooling customers. With the loss of the aerospace customer base to Moog and loss attributable to the tooling business, Mold & Engineering has shifted its focus to metal 3D printing and plastic 3D printing services for the auto industry. This has

helped supplement the loss of the tooling revenue but, has not generated sufficient cash flow to service the debt associated with the shutdown of the tooling business.

36.     In addition, the Debtor has recently been faced with costly litigation in the United States District Court for the Northern District of Illinois and in the state courts in Michigan. The litigation has been a drain on Debtor's personnel and financial resources.

## IMPACT OF COVID-19

37.     By early 2020, after having successfully shed the tooling business, Mold & Engineering was trending toward a positive cash flow – this despite continuing to carry the tooling debt. Unfortunately, COVID-19 hit the auto industry heavy in March 2020, wiping out the positive gains made by Mold & Engineering in late 2019 and 2020.

38.     The shutdown due to COVID-19 had a significant negative impact on Mold & Engineering's operations and revenue. Customer orders and requirements deceased substantially at the outset of the shutdown due to reduced production and workflows. Mold & Engineering's revenue dropped by approximately 40% compared to 2019 revenue reduced by the revenue generated by the tooling operations.

39.     On April 15, 2020, Mold & Engineering received a loan under the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") in the amount of $554,100.00, which has been forgiven in full.

40.     In addition, Mold & Engineering submitted a request directly to the Small Business Administration ("SBA") for an Economic Injury and Disaster Loan.  On August 31, 2020, the SBA issued a secured disaster loan to Mold & Engineering in the amount of $150,000 with an annual interest at the rate 3.75% (the "EIDL Loan").  Monthly payments in the amount of $731.00 on the EIDL Loan are scheduled to begin in August 2021. The SBA has recorded a blanket UCC Financing Statement with respect to the EIDL Loan.

41.     Mold & Engineering applied for and received a second PPP loan in the amount of $554,133.00 through Level One.  The funds were disbursed on February 2, 2021.  During the covered period, Mold & Engineering has potential forgiveness payments in the amount of the funds received.  The PPP Loan Forgiveness Application will be submitted seeking forgiveness of the entire loan amount.  It is anticipated that the entire PPP loan will be forgiven.

42.     Since the resumption of production in the auto industry and the lifting of the shutdown orders, Mold and Engineering has experienced a recovery in its revenue.   Assuming  no  additional  shutdowns  or  production  stoppages,  it  is

anticipated Mold and Engineering's revenue will return to 2019 level, less the revenue generated by tooling operation, by mid-2021.

**DEBTOR'S NEED FOR USE OF
CASH COLLATERAL**

43.    It is necessary for the Mold & Engineering to use Operating Cash in order to maintain business and the going concern value for the benefit of creditors. Of immediate urgency is the need to fund payroll and to satisfy vendors on a going forward basis.

44.    The Debtor proposes to use the Cash Collateral for the payment of employee salaries, payroll, taxes, and other general operating and working capital purposes in the ordinary course of business to ensure that operations are not interrupted.

45.    The Debtor has prepared and delivered to the Bank an initial 13-week projected budget and such budget has been reviewed by the Debtor and its management team.

46.    Debtor and the Bank have engaged in negotiations for the consensual use of the Cash Collateral.

47.    The Debtor has and will continue to need the use of the Cash Collateral to pay immediate necessary ordinary course of business expenditures. These expenditures will enable the Debtor to continue operating its business in the ordinary course, immediately fund its payroll in order to maintain and safeguard

the pre-petition collateral. The Debtor's use of the Operating Cash is also necessary to maintain the value of the Pre-Petition collateral, and to provide Mold & Engineering with working capital necessary to maintain operations. Absent the use of Cash Collateral, Mold & Engineering does not have adequate working capital to continue operations.

48. Immediate irreparable harm will occur to the Debtor, the employees, creditors and the estates if the Debtor is unable to use Cash Collateral.

49. In the absence of a court order authorizing the use of the Cash Collateral, the Debtor will be unable to meet its payroll and other operating expenses and will be forced to cease operations immediately, rather than continuing efforts to maximize value for the estates and creditors.

If sworn, Affiant can testify competently to the facts set forth herein.

**FURTHER DEPONENT SAYETH NOT.**

3/25/2021

John Tenbusch
Member

Sworn to before me on this
_25_ day of March, 2021

_____, Notary Public

SHEILA A. OLIVIO
Notary Public, State of Michigan
County of Livingston
My Commission Expires Nov. 28, 2025
Acting in the County of _Wayne_

**EXHIBIT C**

**<u>BUDGET</u>**

## Linear AMS, LLC

| | Beginning Cash | March 3/25/2021 | 4/1/2021 | 4/8/2021 | 4/15/2021 | 4/22/2021 | 4/29/2021 | April 5/6/2021 | 5/13/2021 | 5/20/2021 | 5/27/2021 | May 6/3/2021 | 6/10/2021 | 6/17/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Collected / Actual Cash Collected | 175,520.30 | 32,532 | 132,309 | 35,727 | 121,622 | 109,359 | 87,588 | 70,098 | 197,943 | 126,613 | 60,000 | 78,449 | 70,293 | 42,047 |
| Cash Needed | | 54,869 | 128,097 | 80,563 | 89,254 | 98,643 | 106,077 | 121,015 | 99,611 | 107,647 | 106,866 | 99,573 | 109,202 | 101,776 |
| Net Cash Effect | | (22,337) | 4,212 | (44,836) | 32,368 | 10,716 | (18,488) | (50,917) | 98,331 | 18,966 | (46,866) | (21,124) | (38,910) | (59,730) |
| Cash Balance | | 151,182.87 | 157,395.30 | 112,559.51 | 144,927.82 | 155,643.53 | 137,155.39 | 86,238.55 | 184,569.95 | 203,536.17 | 156,670.18 | 135,546.39 | 96,636.59 | 36,907.03 |

Cum Cash 1,340,099.22
Cum Spent 1,303,192.19
Total Cash 36,907.03

Cash Flow Projection — 13 Week Total

| | March 3/25/2021 | 4/1/2021 | 4/8/2021 | April 4/15/2021 | 4/22/2021 | 4/29/2021 | 5/6/2021 | 5/13/2021 | May 5/20/2021 | 5/27/2021 | 6/3/2021 | June 6/10/2021 | 6/17/2021 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Monthly Payments | | | | | | | | | | | | | | |
| Level Five Hse DOC | | 13,600 | | | | | 13,600 | | | | 13,600 | | | |
| Midland Capital M280 | | 7,812 | | | | | 7,812 | | | | 7,812 | | | |
| Complete Capital HP | 7,358 | | | | | 7,358 | | | 7,358 | | | | 7,358 | |
| Highland Capital HP | 7,416 | | | | | 7,416 | | | 7,416 | | | | 7,416 | |
| Semars HP | 10,607 | | | | | | 10,607 | | | 7,416 | 10,607 | | | |
| Complete Capital M280 | | | 7,812 | | | | | | | | | | | |
| Renaissance Capital Hslo | | | | 7,751 | | | | 7,751 | | 7,416 | 7,751 | | | |
| Semars HP | | 487 | | | | 487 | 487 | | | | 487 | | | |
| CIT Captain HP Daws Stations | | | 2,286 | | | | | 2,286 | | | 2,286 | | | |
| Complete Capital Hslo | | | | | | 2,772 | 7,556 | | | 2,722 | | | | |
| Complete Capital | | 2,722 | | | 2,025 | | | | | | | | | |
| Past due pymt to made (1) | | | | | | | | | 7,556 | | | | | |
| Highland Capital HP Past due pymt to made (3) | | | | | | | | 7,751 | 7,416 | 7,416 | | | 7,558 | |
| Complete Capital HP Past due pymt to made (2) | | | | | | | | | | | | | | |
| Semars HP Past due pymt to made (1) | | | | | | | | | | | | | | |
| Renaissance Capital- Hslo Past due pymt to made (1) | | | | | | | | | | | | | | |
| Renaissance Capital- Hslo Past due pymt to made (2) | | | | | | | | | | | | | | |
| Less: Interest billed below | | (11,158) | (2,495) | (1,793) | (1,911.5) | (4,496) | | (5,916) | | (1,465) | (11,168) | (2,496) | (12,742) | |
| | 31,221 | | 7,402 | 5,958 | | 13,446 | 35,883 | 11,652 | 11,154 | 5,771 | 24,060 | | 5,816 | |

| COS | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bldg Maintenance | 11355 | 11355 | 11356 | 11356 | 11556 | 11556 | 11556 | 11556 | | 23112 | | | 11555 | |
| Complete Capital Hrdwr GPS Off | 342 | 342 | 342 | 342 | 342 | 342 | 341 | 341 | | 341 | | | 342 | |
| Consulting GPS Off | 277 | 277 | 277 | 277 | 1427.07 | | 277 | 277 | 277 | | 277 | | 1427.07 | |
| Electricity Oil | | | | 29000 | 277 | | 277 | 23000 | 277 | | 277 | | 277 | |
| Electricity Off | | | 5500 | | | | 5500 | | | 5500 | | | 29000 | |
| Equip Repair & Maint | 368 | 368 | 367 | 367 | 367 | 367 | 367 | 367 | 367 | | 367 | | 368 | |
| Freight Outbound | 807 | 807 | 807 | 808 | 808 | 807 | 808 | 808 | 808 | | 808 | | 807 | |
| Lease Equip Software | | | | | 1734.18 | | | | | | | | 1734.18 | |
| Medical Insurance COS | | | | | 6260 | | | | | | | | 6260 | |
| Medical Insurance Admin | | | | | 3200 | | | | | | | | 3200 | |
| Natural Gas Oil | | | | | 18 | | | | | | | | 18 | |
| Natural Gas Off | | | | | 82 | | | | | | | | 82 | |
| Outside Service | 1824 | 1824 | 1824 | 1824 | 1824 | 1824 | 1824 | 1824 | 1824 | 1825 | 1825 | | 1824 | |
| Property Taxes Off | | | | | 7171.73 | | | | 7171.73 | | | | 7171.73 | |
| Rent - Clumizus | | | | | | 29604.17 | | | | 29604.17 | | | | |
| Rent | 29604.17 | | | | | | 6000 | 459 | | | | | | |
| Shop Consumables | 1059 | 1059 | 1059 | 1058 | 1058 | 1058 | 1058 | 1058 | 1058 | 1058 | 1058 | | 1059 | |
| Travel | 475 | 475 | 475 | 475 | 475 | 474 | 474 | 474 | 474 | 474 | 474 | | 475 | |
| Wages & Payroll Taxes | 50726.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | 31446.92 | | 31446.92 | |
| Office Wages | 3773.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | 3053.08 | | 3053.08 | |
| Accrued Other Wages | | 1235 | 1235 | 1235 | 1235 | 1235 | 1235 | 1235 | 1235 | 1235 | 1235 | | 1235 | |
| Water Oil | | | 535 | | | | 555 | 975 | 740 | 900 | 555 | 975 | 555 | |
| Water Off | | | | | 740 | | | | 740 | | | | 740 | |
| Workers Comp | | | | | 1191 | | | | 1191 | | | | 1191 | |
| Building Electrical/Water Meter Divide Fee | | | | 459 | | | | 459 | | | | | 459 | |

| AGENCY PAYROLL EXPENSSA | | | | | | | | | | 231.3 | | | 231.3 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMR TRAINING EX | | | | | 231.3 | | | | | | | | | |
| AUTO SGA | | | | | | | | | | | | | | |
| BANK CHARGES FEES SGA | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 780 | |
| BUSINESS MEALS ENTERTAINMENT | | | | | 2800 | | | | 2800 | | | | 2800 | |
| COMMISSIONS SGA | | | | | 866 | | | | 866 | | | | 866 | |
| COMMUNICATIONS SGA | | | 731 | 731 | 731 | | | | 731 | | | | 2025 | |
| COMPUTER EQUIP HARDWARE SGA | | | | | 2025 | | | | | | | | | |
| CONSULTING FEES SGA | 900 | 900 | 900 | 900 | | 900 | 900 | 975 | 900 | 900 | 900 | 975 | 555 | |
| LEASE EQU SOFTWARE SGA | | | | | | | | | | | | | | |
| LICENSES & PERMITS | | | | | | | | | | | | | | |
| MEDICAL INS EX B.E.A.M | | | | | | | | | | | | | | |
| OFFICE SUPPLIES | 407 | 407 | 407 | 407 | 407 | 407 | 407 | 407 | 407 | 407 | 407 | 407 | 414 | |
| OUTSIDE SERVICE SGA | 1570 | 1569 | 1569 | 1569 | 1569 | 1569 | 1569 | 1569 | 1569 | 1569 | 1569 | 1569 | 1571 | |
| POSTAGE EXPENSE | | | | | 65 | | | | 65 | | | | 65 | |
| PROFESSIONAL FEES-ATTORL SHARP | | | | | 7500 | | | | 7500 | | | | 7500 | |
| PROFESSIONAL FEES-DBT | | | | | 5000 | | | | 5000 | | | | 5000 | |
| PROFESSIONAL FEES-B.e.Chester S Fees | | | 5000 | | | | | 5000 | 2500 | | | | 5000 | |
| REPAIRS AND MAINTENANCE | | | 2500 | | | | | | 2500 | | | 2500 | 2500 | |
| TRAVEL TRANS SGA | | | | | 740 | | | | 740 | | | | 740 | |
| | | | | | 1191 | | | | 1191 | | | | 1191 | |

| Equipment Rental | | | | | 486 | | | | 486 | | | | 486 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest | | 11168 | 2496 | 1793 | 0 | 4496 | 14732 | 9596 | 820 | 1465 | 11168 | 2496 | 820 | |
| Insurance | | | | | 1911.9 | | | | 1911.9 | | | | 1911.9 | |
| Subtotal | 54,869 | 56,875 | 72,541 | 81,356 | 98,445 | 92,290 | 85,126 | 87,759 | 96,489 | 101,095 | 75,513 | 109,092 | 93,490 | |
| Total | 54,869 | 126,097 | 80,543 | 89,154 | 98,445 | 106,077 | 121,013 | 99,411 | 107,647 | 106,866 | 99,573 | 109,002 | 101,776 | |