UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

LINEAR MOLD & ENGINEERING, LLC,

    Debtor.

Case No.: 21-42617-mar
Chapter 11

Hon. Mark A. Randon

## AFFIDAVIT OF JOHN TENBUSCH
## AS MAJORITY MEMBER OF THE DEBTOR

**STATE OF MICHIGAN**     )
                                     ) SS
**COUNTY OF WAYNE**     )

John Tenbusch, being duly sworn, deposes and says:

1. I am the 96.5% member in Linear Acquisition, LLC ("Acquisition"), which is the sole member of Linear Mold & Engineering, LLC d/b/a Linear AMS ("Mold & Engineering" or "Debtor"). I serve as the Chief Executive Officer of Mold & Engineering. In my capacity as the majority member of Acquisition and CEO of Mold & Engineering, I am familiar with the day-to-day operations, business affairs, corporate structure and books and records of the Debtor. I am authorized to submit this affidavit (the "Affidavit") on behalf of the Debtor.

2. I make this Affidavit to assist the Court and other parties in understanding the circumstances that compelled the Debtor to file its Chapter 11 proceeding, and the following first day motions:

   a. Motion Pursuant to Sections 105(a), 361, 362, 363, 364, and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral; (B) Granting Adequate Protection; and (C) Scheduling a Final Hearing on the Motion;

   b. First Day Motion for Authorization (A) to Pay Pre-Petition Wages, Salaries, Benefits, and Reimbursable Expenses, and to Continue Existing Employee Policies, and (B) to Continue in Effect Workers' Compensation Programs;

   c. First Day Motion for Order Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services Pending Determination of Adequate Assurance of Payment for Future Utility Services, and Approving the Proposed Adequate Assurance Procedures Under Section 366 of the Bankruptcy Code.

3. The Debtor is operating its business and managing its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, information supplied to me by other employees of the Debtor and/or professionals retained by the Debtor, is information I learned through review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I

were called upon to testify, I could and would testify competently to the facts set forth herein.

## GENERAL BACKGROUND

5. Mold & Engineering commenced this voluntary case under Chapter 11, Subchapter V, of the Bankruptcy Code on March 25, 2021 (the "Petition Date"). The Debtor is authorized to continue to operate its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. The Subchapter V Trustee has not been appointed.

7. I originally incorporated the predecessor to the Debtor, Linear Mold & Engineering, Inc. ("Mold, Inc."), on May 23, 2003, as a full-service plastics mold, tooling and production service provider. I was the sole shareholder and Mold, Inc. started as a two-man operation with limited customers.

8. Over time, Mold, Inc. grew to 125 employees with approximately 300 varied customers. With full machine shop capabilities, Mold, Inc. become an industry leader in mold flow analysis, plastic injection mold simulation capabilities, full black-box design and advanced process support.

9. Because of Mold, Inc.'s reputation as an industry leader, in 2015, Moog Inc. ("Moog"), a New York corporation and worldwide designer, manufacturer and integrator of precision control components and systems, acquired 70% of the stock of Mold, Inc., with the objective of integrating into

acquired 70% of the stock of Mold, Inc., with the objective of integrating into Mold, Inc.'s customer relationships, specifically its aerospace customer base. I negotiated the sale of the remaining 30% of the Mold, Inc. stock and settled with Moog in January 2017.

10. After Moog's acquisition of the Mold, Inc. stock, I served as a vice-president and director of Moog and facilitated its integration into the Mold, Inc. customers. After a short period with Moog, I resigned to pursue other opportunities.

11. After 2 years of operation, Moog determined that it would divest itself of the Mold, Inc. operations and transition the aerospace customers into Moog.

12. In June 2017, I organized Acquisition, with the intent of re-purchasing the Mold, Inc. stock from Moog. Contemporaneously, Linear Realty, LLC was formed as a single member limited liability company, with Acquisition as its sole member, in order to purchase the real estate located at 12926 Stark Road, Livonia, Michigan 48150 (the "Stark Road Property").

13. After the re-purchase of the Mold, Inc., stock by Acquisition, Mold, Inc., was merged into Mold & Engineering. Acquisition is the sole member of Mold & Engineering and Realty.

14. At the time, the Mold & Engineering operations were housed in three buildings – two leased locations and the Stark Road Property. In order to

consolidate operations, grow the business, expand revenue and improve profitability, on September 29, 2018, Realty purchased the property located at 12163 Globe Street, Livonia, Michigan (the "Globe Street Property"). On September 1, 2018, Mold & Engineering entered into a five (5) year lease with Realty for the Globe Street Property and consolidated all operations in one location.

15. However, in order to effectively grow the molding operations, the Globe Street Property needed to supplement its power supply. Unfortunately, over the course of nine (9) months Mold & Engineering was unable to adequately increase the power supply at the Globe Street Property and determined that the molding operations needed to be moved to a new location with sufficient power resources.

16. Consequently, Mold & Engineering entered into a lease on May 7, 2019 for the property located at 400 Parkland Drive, Charlotte, Michigan (the "Charlotte Property"). The molding operations were permanently relocated to the Charlotte Property.

17. By June 2019, it became clear that revenue from the tooling operations had fallen sharply and would not recover in a reasonable timeframe. The tooling operations were no longer profitable and were draining resources from other profitable operations. Therefore, a decision was made to shut down the

tooling operations and to focus on the plastics, injection molding and additive business.

18. This left Mold & Engineering with substantial debt associated with the tooling business and no active tooling operations or ability to generate revenue associated with the tolling industry to satisfy that debt.

## CURRENT EMPLOYEES AND MANAGEMENT TEAM

19. In 2017, at the time Acquisition acquired the stock of Mold, Inc., from Moog, the company had approximately 91 employees. Mold & Engineering immediately began trimming the employee base to only those employees needed for continued operations. Currently, Mold & Engineering employs approximately twenty-eight (28) employees across its various business operations, including management, sales, engineering, account management, production, production management and human resources (collectively, the "Employees"). All production employees are located at the Charlotte Property.

20. The management team is made up of myself and Louis Young ("Young"). Our offices are located in the Globe Street Property. I am the Chief Executive Officer and the 96.5% member of Acquisition. I have a background in design engineering for tooling and am involved in all aspects of operations, sales and production.

21. Young, an industrial engineer, joined Mold, Inc., in 2003 when it was originally established. He stayed with the company throughout the time it was under the ownership of Moog. In 2017 when Moog determined that it wanted to divest itself of the Mold, Inc. operations, Moog approached Young to assist in the process. Young approached me regarding the divestiture and together we acquired the Mold, Inc., stock through Acquisition. Young has remained with Mold & Engineering as its President. Young holds a 3.5% interest in Acquisition.

## THE PREPETITION SECURED CLAIMS

22. In order to meet operational expenses, Mold & Engineering maintains a line of credit with the Level One Bank (the "Bank" or "Level One") as follows:

> On July 17, 2017, Mold & Engineering executed a Promissory Note (Line of Credit-Prime), a Loan Agreement and two Security Agreements with respect specific equipment and all assets, in the principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in favor of Level One Bank (the "Mold & Engineering Note"). On November 1, 2018, Mold & Engineering executed an Allonge to the Promissory Note reducing the face amount of the Linear Note from Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) to Two Million and 00/100 Dollars ($2,000,000.00). In support of the Mold & Engineering Note, the John Tenbusch Revocable Trust, Young and I executed a Continuing Guaranty.

(the "Mold & Engineering Note")

23. The approximate outstanding balance due on the Mold & Engineering Note as of the Petition Date is $957,945.02.

24. In August of 2018, Realty entered into a series of loan agreements with the Bank, including a term loan and non-revolving line of credit, including a Swap Agreement with the Bank of Montreal, secured by a mortgage on the Globe Street Property (collectively, the "Realty Loans") as follows:

> a. On August 2, 2018, Realty executed a Promissory Note (Term Loan), a Loan Agreement, Mortgage and Assignment of Rents with respect to property located at 12163 Globe Street, Livonia, Michigan 48150 in the principal amount of One Million Six Hundred Fifty Thousand and 00/100 Dollars ($1,650,000.00) ("Realty Note #1"). In support of the Realty Note #1, Acquisition, Mold & Engineering, the John Tenbusch Revocable Trust, Young and I executed a Continuing Guaranty.
>
> b. On August 2, 2018, Realty executed a Promissory Note (Line of Credit) which reflected an assumption of Mold & Engineering Debt and was subsequently Amended and Restated to a Non-Revolving Line of Credit, a Loan Agreement, Mortgage and Assignment of Rents with respect to property located at 12163 Globe Street, Livonia, Michigan 48150 in the principal amount of One Million Three Hundred and Twenty Thousand and 00/100 Dollars ($1,320,000.00) ("Realty Note #2"). In support of the Realty Note #2, Acquisition, Mold & Engineering, the John Tenbusch Revocable Trust, Young and I executed a Continuing Guaranty. (collectively, Realty Note #1 and Realty Note #2 shall be referred to as the "Realty Debt")

25. Mold & Engineering guaranteed the Realty Debt.

26. In connection with tenant improvements for its benefit, Mold & Engineering entered into three equipment finance agreements for the purchase and installation of solar panels and related equipment at the Globe Street Property as follows:

a. An Equipment Finance Agreement with Ascentium Capital, LLC (230652), dated August 21, 2018, with respect to specific equipment: Solar Panels, Electrical upgrades in the amount of One Hundred Sixty-Five Thousand and 00/100 Dollars ($165,000.00). I have personally guaranteed this Equipment Finance Agreement along with Young;

b. An Equipment Finance Agreement with Ascentium Capital, LLC (230695), dated August 21, 2018, with respect to specific equipment: Solar Panels, Electrical upgrades in the amount of One Hundred Fifteen Thousand and 00/100 Dollars ($115,000.00). I have personally guaranteed this Equipment Finance Agreement along with Young; and

c. An Equipment Finance Agreement with Ascentium Capital, LLC (232862), dated August 21, 2018, with respect to specific equipment: LED Lighting, HVAC, Insulation, Roofing, Efficient Doors & Windows in the amount of One Hundred Fifteen Thousand and 00/100 Dollars ($115,000.00). I have personally guaranteed this Equipment Finance Agreement along with Young.

(collectively the "Ascentium Capital Debt")

27. October 11, 2019, Acquisition, Realty, Mold & Engineering, the John Tenbusch Revocable Trust, Young and I entered into a Loan Affirmation and Restructure Agreement ("Forbearance Agreement") with the Bank in connection with the Level One Bank Debt. On April 2, 2020, an Amendment to Loan Affirmation and Restructure Agreement ("Amended Forbearance Agreement") was executed. The Forbearance Period under the Amended Forbearance Agreement expires on April 1, 2021.

28. Prior to the Petition Date, Realty closed on the sale of the Globe Street Property, paid the Realty Debt and Ascentium Capital Debt in full.

29. Debtor negotiated a Lease Agreement with the Purchaser of the Globe Street Property on favorable rental terms. Under the terms of the Lease Agreement, Debtor is responsible for the collection and remittance of the aggregate base rent on behalf of itself and the other Globe Street Property tenants. Debtor is also obligated to collect and pay the Globe Street Property expenses on behalf of itself and the other building tenants.

30. In order to grow its business, beginning in about July 2018, Mold & Engineering entered into a series of leases titled as equipment financing agreements to lease the necessary machinery and equipment to expand the 3D metal printing, 3D plastic printing and additive business as follows:

   a. An Equipment Finance Agreement with Complete Capital Services, Inc., July 17, 2018, and assigned to People's Capital Leasing Corp. with respect to specific equipment: 1-TruMark Station 5000 Work Station including all accessories and/or options in the original amount of One Hundred Thirty-Four Seven Hundred and Two and 00/100 Dollars ($134,702.00).

   b. An Equipment Finance Agreement with Complete Capital Services, Inc., September 18, 2018, with respect to specific equipment: 1-EOSINT M280 with 400W Machines including all accessories and/or options in the original amount of Three Hundred Eighty-Eight Thousand and Ninety-Nine and 50/100 Dollars ($388,099.50).

   c. An Equipment Finance Agreement with Midland States Bank dated September 18, 2018, with respect to specific equipment: 1-EOSINT M280 3D Printer including all accessories and/or options in the original amount of Three Hundred Eighty-Eight Thousand and Ninety-Nine and 50/100 Dollars ($388,099.50).

d. An Equipment Finance Agreement with Complete Capital Services, Inc., dated November 16, 2018, which was assigned to Bank of the West with respect to specific equipment: 1 HP Jet Fusion 3D 4210 Printer including all accessories and/or options in the original amount of Three Hundred Fifty Nine Thousand Two Hundred Eleven and 00/100 Dollars ($359,211.00).

e. An Installment Payment Agreement with CIT Bank, N.A., dated November 19, 2018, with respect to specific equipment: Jet Fusion Equipment in the original amount of Ninety-Nine Thousand Seven Hundred and 00/100 Dollars ($99,700.00).

f. An Equipment Finance Agreement with Renaissance Capital Alliance, LLC, November 28, 2018, with respect to specific equipment: Caterpillar Lift Truck Model 2C6000 S/N AT83F42824 together with all attachments and accessories thereto in the original amount of Thirty-Three Thousand Two Hundred Forty-Six and 63/100 ($33,246.63).

g. An Equipment Finance Agreement with Highland Capital Corporation, November 16, 2018, with respect to specific equipment: 1 HP Jet Fusion 3D 4210 Printer including all accessories and/or options in the amount of Three Hundred Ninety-Seven Thousand Seven Hundred and Seventy-Two and 00/100 Dollars ($397,772.00).

(collectively the "Equipment Financing Agreements")

## DEBTOR'S PREPETITION ASSETS

31. As of the Petition Date, the Debtor's assets were chiefly made up of (1) earned accounts receivable, (2) equipment and vehicles used in the operations of Debtor's business, and (3) executory contracts and going concern value (good will). The Debtor estimates the fair market value of its assets on the Petition Date as follows:

|  |  |  |
|---|---|---|
| Accounts Receivable: | | $ 1,117,198.34 |
| Personal Property: | | $ 271,225.00 |
| Cash on Hand: | | $ 176,801.26 |
| | Total: | $ 1,565,224.60 |

## EVENTS LEADING TO THE BANKRUPTCY FILING

32. A number of factors have contributed to the Debtor's decision to file for relief under Chapter 11, Subchapter V of the Bankruptcy Code.

33. For some period of time, the Debtor has been losing money on an annual basis and has maintained operations in part through my infusion of capital into the company. For example, in September 2019 Level One offset a Charles Schwab cash collateral account in the amount of $2,189,951.78 I had pledged as part of my personal guarantee in order to reduce Mold & Engineering's debt load.

34. At the time of the offset, Mold & Engineering auctioned its equipment not needed to sustain the continuing mold making operations. The auction proceeds further reduced the Bank debt.

35. Mold & Engineering's losses were driven chiefly by a change in the structure of the auto industry and shifting demands for the services offered by Mold & Engineering. Historical profits prior to the ownership by Moog were largely driven by customers in the aerospace industry, metal 3D printing and tooling customers. With the loss of the aerospace customer base to Moog and loss attributable to the tooling business, Mold & Engineering has shifted its focus to metal 3D printing and plastic 3D printing services for the auto industry. This has

helped supplement the loss of the tooling revenue but, has not generated sufficient cash flow to service the debt associated with the shutdown of the tooling business.

36. In addition, the Debtor has recently been faced with costly litigation in the United States District Court for the Northern District of Illinois and in the state courts in Michigan. The litigation has been a drain on Debtor's personnel and financial resources.

## IMPACT OF COVID-19

37. By early 2020, after having successfully shed the tooling business, Mold & Engineering was trending toward a positive cash flow – this despite continuing to carry the tooling debt. Unfortunately, COVID-19 hit the auto industry heavy in March 2020, wiping out the positive gains made by Mold & Engineering in late 2019 and 2020.

38. The shutdown due to COVID-19 had a significant negative impact on Mold & Engineering's operations and revenue. Customer orders and requirements deceased substantially at the outset of the shutdown due to reduced production and workflows. Mold & Engineering's revenue dropped by approximately 40% compared to 2019 revenue reduced by the revenue generated by the tooling operations.

39. On April 15, 2020, Mold & Engineering received a loan under the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") in the amount of $554,100.00, which has been forgiven in full.

40. In addition, Mold & Engineering submitted a request directly to the Small Business Administration ("SBA") for an Economic Injury and Disaster Loan. On August 31, 2020, the SBA issued a secured disaster loan to Mold & Engineering in the amount of $150,000 with an annual interest at the rate 3.75% (the "EIDL Loan"). Monthly payments in the amount of $731.00 on the EIDL Loan are scheduled to begin in August 2021. The SBA has recorded a blanket UCC Financing Statement with respect to the EIDL Loan.

41. Mold & Engineering applied for and received a second PPP loan in the amount of $554,133.00 through Level One. The funds were disbursed on February 2, 2021. During the covered period, Mold & Engineering has potential forgiveness payments in the amount of the funds received. The PPP Loan Forgiveness Application will be submitted seeking forgiveness of the entire loan amount. It is anticipated that the entire PPP loan will be forgiven.

42. Since the resumption of production in the auto industry and the lifting of the shutdown orders, Mold and Engineering has experienced a recovery in its revenue. Assuming no additional shutdowns or production stoppages, it is

anticipated Mold and Engineering's revenue will return to 2019 level, less the revenue generated by tooling operation, by mid-2021.

## DEBTOR'S NEED FOR USE OF CASH COLLATERAL

43. It is necessary for the Mold & Engineering to use Operating Cash in order to maintain business and the going concern value for the benefit of creditors. Of immediate urgency is the need to fund payroll and to satisfy vendors on a going forward basis.

44. The Debtor proposes to use the Cash Collateral for the payment of employee salaries, payroll, taxes, and other general operating and working capital purposes in the ordinary course of business to ensure that operations are not interrupted.

45. The Debtor has prepared and delivered to the Bank an initial 13-week projected budget and such budget has been reviewed by the Debtor and its management team.

46. Debtor and the Bank have engaged in negotiations for the consensual use of the Cash Collateral.

47. The Debtor has and will continue to need the use of the Cash Collateral to pay immediate necessary ordinary course of business expenditures. These expenditures will enable the Debtor to continue operating its business in the ordinary course, immediately fund its payroll in order to maintain and safeguard

the pre-petition collateral. The Debtor's use of the Operating Cash is also necessary to maintain the value of the Pre-Petition collateral, and to provide Mold & Engineering with working capital necessary to maintain operations. Absent the use of Cash Collateral, Mold & Engineering does not have adequate working capital to continue operations.

48. Immediate irreparable harm will occur to the Debtor, the employees, creditors and the estates if the Debtor is unable to use Cash Collateral.

49. In the absence of a court order authorizing the use of the Cash Collateral, the Debtor will be unable to meet its payroll and other operating expenses and will be forced to cease operations immediately, rather than continuing efforts to maximize value for the estates and creditors.

If sworn, Affiant can testify competently to the facts set forth herein.

**FURTHER DEPONENT SAYETH NOT.**

_____ 3/25/2021
John Tenbusch
Member

Sworn to before me on this
25 day of March, 2021

_____
Livingston, Notary Public

SHEILA A. OLIVIO
Notary Public, State of Michigan
County of Livingston
My Commission Expires Nov. 28, 2025
Acting in the County of Wayne