## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 21-42617-mar |
| | ) | Chapter 11 |
| **LINEAR MOLD & ENGINEERING, LLC,** | ) | Hon. Mark A. Randon |
| | ) | |
| Debtor. | ) | |

_____

## LEVEL ONE BANK'S OBJECTION TO
## DEBTOR'S PLAN OF REORGANIZATION

Creditor Level One Bank ("Level One"), by its attorneys Dawda, Mann, Mulcahy & Sadler, PLC, for its Objection to Debtor's Plan of Reorganization (Doc 100, the "Plan"), states:

## I.    BACKGROUND

1.    On March 26, 2021 (the "Petition Date"), Debtor filed its Voluntary Petition for Non-Individuals Filing for Bankruptcy (Doc 1) (the "Petition") under Chapter 11 of the Bankruptcy Code (the "Code").

2.    Since the Petition Date, the Debtor has continued in possession of its property and has continued to operate its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.    Debtor is a Michigan limited liability company that manufactures specialized plastic mold tooling, production, and prototypes.

4.     Level One has a secured claim against Debtor pursuant to a Loan Agreement dated July 17, 2017; a Loan Affirmation and Restructure Agreement dated December 31, 2019; a Second Amendment to Loan Affirmation and Restructure Agreement dated October 13, 2020; and associated loan documents executed pursuant to the terms of the same (collectively the "Loan Documents").

5.     The Loan Documents provide that in the event of a default by Debtor, Debtor is to pay a default rate of interest of three (3%) percent greater than the then-applicable prime rate of interest. See Loan Agreement, **Exhibit 1**, p. 3-4. The Loan Documents further permit Level One to recover its costs, reasonable attorneys' fees, and outside consultants' fees reasonably incurred in collection or enforcing payment upon the occurrence of an "Event of Default." See Loan Agreement, **Exhibit 1**, p. 2.

6.     In recognition of Debtor's default under the terms of the Loan Documents, Debtor and Level One entered into the Loan Affirmation and Restructure Agreement on December 31, 2019. See generally Loan Affirmation and Restructure Agreement, **Exhibit 2**.

7.     That agreement recognized that Debtor had defaulted under the Loan Documents and provided that Level One would forbear from acting on that default until April 1, 2020 unless an "Event of Default" occurred. See Loan Affirmation and Restructure Agreement, **Exhibit 2**, at §§ 2, 9-10.

8.     The Second Amendment to Loan Affirmation and Restructure Agreement dated October 13, 2020 extended that the Forbearance Period to April 1, 2021, allowing Level One to pursue its rights and remedies permitted by the Loan Documents, including collecting the Default Rate of Interest as of that date. See **Exhibit 3**, at § 1.

## II.     LEVEL ONE'S OBJECTIONS TO THE PLAN

### A. <u>Debtor Misstates the Amount of Level One's Claim</u>

9.     Level One objects to Debtor's misstatement of the amount of its claim.

10.     The Code requires that, for a Chapter 11 reorganization plan to be fair and equitable, the Plan must provide that each secured creditor receive the full value of their claim where the property in which they hold a security interest has a greater value than the amount of their claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II).

11.     The Code further provides that where a secured claim is secured by property with a greater value than such claim, the claim's holder is permitted to recover reasonable fees, costs, and charges provided under the underlying agreement. 11 U.S.C. § 507(b).

12.     On April 8, 2021, Level One submitted a claim for $971,753.32 plus all attorney's fees, interest, and costs per the terms of the Loan Documents.

13.     Debtor's Plan discloses that Level One's claim is secured by all of Debtor's personal property, which Debtor values at $2,348,879.33. (Doc 100, p. 6).

3

14.     As such, the Plan must be modified to provide full payment of Level One's claim of $971,753.32 plus all attorney's fees, interest, and costs per the terms of the Loan Documents.

## B. **Debtor's Plan is Not Feasible**

15.     Level One objects to the Plan as it is not feasible as required by the Code. See 11 U.S.C. § 1129(a)(11).

16.     As a prerequisite to plan confirmation, § 1129(a)(11) requires that, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

17.     Therefore, for a Chapter 11 plan to be confirmed, it must be feasible, in other words, the plan must provide a reasonable probability of payment. *See In re Shefa, LLC,* 524 B.R. 717, 741 (Bankr. E.D. Mich. 2015) (affirmed by *Shefa, LLC v. Oakland Cnty. Treasurer (In re Shefa, LLC)*, 535 B.R. 165 (E.D. Mich. 2015)).

18.     To demonstrate feasibility, debtor must carry its burden to demonstrate, by a preponderance of the evidence, that its Chapter 11 plan is not likely to fail. *See In re Griswold Bldg., LLC*, 420 B.R. 666, 697 (Bankr. E.D. Mich. 2009).

19.     Courts determine the feasibility of a plan based on objective fact, a plan cannot rest on "visionary promises," but must provide a realistic and workable

4

framework for reorganization. *See Id.* (quoting *In re Made in Detroit, Inc.*, 299 B.R. 170, 175 (Bankr. E.D. Mich. 2003)).

20.     To determine feasibility, courts consider the following factors:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

> *Griswold*, 420 B.R. at 697 (Bankr. E.D. Mich. 2009).

21.     Courts also consider the debtor's past financial performance, the availability of credit if the plan is dependent on financing, and the plan's term. *See Shefa*, 524 B.R at 741 (Bankr. E.D. Mich. 2015) (quoting *Griswold*, 420 B.R. at 697 (Bankr. E.D. Mich. 2009)).

22.     In *Shefa*, the Bankruptcy Court for the Eastern District of Michigan considered whether a Chapter 11 plan was feasible where a debtor's plan contemplated the debtor obtaining financing—for which it did not have a firm commitment from a lender—to make a lump sum payment to a creditor. *Shefa*, 524 B.R at 741-42 (Bankr. E.D. Mich. 2015).

23.     The *Shefa* Court determined such a plan was not feasible, as in the absence of a firm commitment from a lender, the debtor could not show that there

5

was a "reasonable probability" that it would be able to make that lump sum payment. *Id.*[1]

24.     As in *Shefa*, Debtor's Plan is not feasible as it relies on the prospect of financing for which it does not have a firm commitment from a lender to make its lump-sum payment to Level One. (Doc 100, Article 3.2.2.1(c); Doc 100-6)

25.     Debtor's Plan states that after making the initial thirty-six (36) payments—totaling $523,200.00[2]—that "the remaining balance [will be] paid in full in the thirty-seventh (37th) full month after the Confirmation Date." (Doc 100, Article 3.2.2.1(c)).

26.     The Plan makes no mention of Debtor obtaining funds to make that final payment of approximately $448,753.32[3], plus attorney's fees, interest, and costs per the terms of the Loan Documents.

27.     Nowhere in Debtor's Plan or the attached exhibits does Debtor indicate that Debtor has a firm commitment from any lender to provide that replacement financing. *Shefa*, 524 B.R at 741-42 (Bankr. E.D. Mich. 2015).

---

[1] "Without a binding letter of intent or loan agreement, or other presently available funds, the Court first concludes that the Debtor has failed to show that there is a reasonable probability that the Debtor will make the lump sum payment of $690,000.00 to Oakland County on its allowed secured claim." *Id.* at 742.
[2] ($13,600.00 x 12 months) + ($15,000 x 24 months) = $523,200.00.
[3] $971,753.32 - $523,200.00 = $448,553.32.

6

28.     Moreover, Debtor's Exhibit E to the Plan shows that Debtor projects that it will earn a net profit of $19,658.97 over the 4 Year Projection, nowhere near enough to make the final lump sum payment to Level One without refinancing. (Doc 100-6).

29.     Debtor's Plan to pay Level One is not feasible and Debtor's Plan should not be confirmed under 11 U.S.C. § 1129(a)(11) of the Code.

### C. **Debtor's Plan Applies the Incorrect Interest Rate**

30.     Level One objects to the interest rate Debtor seeks to impose on Level One's claim under the Plan.

31.     The Code provides that where a secured claim is secured by property with a greater value than such claim, the claim's holder is permitted to recover reasonable fees, costs, and charges provided under the underlying agreement. 11 U.S.C. § 507(b).

32.     The Plan provides that "Level One shall receive the non-default interest rate set forth in the Level One Loan Documents as of the Petition Date." (Doc 100, Article 3.2.2.2).

33.     That provision ignores the terms of the very loan documents it cites.

34.     The Loan Documents provide that on occurrence of an Event of Default, the interest rate to be charged is the Default Interest Rate. <u>See</u> Loan Agreement, **Exhibit 1**.

35.     The Forbearance Period expired on April 1, 2021 under the Loan Documents, therefore Level One is permitted to exercise its default rights and remedies under the Loan Documents as of that date, including charging the default rate of interest.

36.     Therefore, under the express terms of the Loan Documents, the Default Interest Rate---the Prime Interest Rate plus three (3%) percent---is the appropriate rate of interest under the Plan.

### D. <u>Using Level One's Cash and other Collateral to Pay Junior Claims is Not Fair and Equitable.</u>

37.     Level One objects to the Plan's proposed payment of unsecured claims from Level One's collateral.

38.     For a Chapter 11 plan to be approved over the objection of a class of creditors, it must be fair and equitable. 11 U.S.C. § 1129(b).

39.     For a Chapter 11 plan to be fair and equitable under the Bankruptcy Code it must either (1) allow the holders of secured claims to retain the liens on the collateral that secures their claim and provide deferred cash payments to those claim holders in the amount of their secured interest; (2) if the collateral is sold, provide the secured creditor a lien on the proceeds of that sale for the value of the secured creditor's interest in the collateral; or (3) pay the secured creditor the full value of their claim. 11 U.S.C. § 1129(b)(2)(A)(emphasis added).

40.     The Bankruptcy Court for the Eastern District of Michigan has found "it is hard to see how that is fair and equitable" where a debtor's plan proposes to pay claims that have a lower priority under the Bankruptcy Code with collateral securing a senior claim. *Griswold*, 420 B.R. at 706.

41.     Debtor's Plan discloses that Level One's claim is secured by all of Debtor's personal property assets, including, Debtor's cash on hand, vehicles, equipment used in the operation of its business, and current and aged accounts receivable. (Doc 100, p. 6).

42.     Debtor's Plan proposes to use Level One's cash collateral to begin paying the claims of Debtor's unsecured creditors beginning on March 31, 2022, and prior to Level One's claiming being paid in full. (Doc 100, p. 30-31).[4]

43.     As discussed above, Debtor's Plan does not disclose how it will obtain the cash to make the final lump-sum payment to Level One.

44.     As such, it would not be fair and equitable to allow Debtor to make payments to its unsecured creditors under the Plan from Level One's collateral before Level One's claim is paid in full, especially where the Plan does not disclose how Debtor will pay Level One's claim.

---

[4] "Payments to be made under this plan shall be derived from the operation of Debtor's business." (Doc 100, p. 31)

## E. **The Default Provision Provides Debtor Too Much Time in the Case of a Default Under the Plan**

45.     Level One objects to the Default provision of the Plan.

46.     The Loan Documents provided Debtor five (5) days from a notice of default before Level One was permitted to take action to recover the debt.

47.     The Interim Order provided a five (5) day grace period and five (5) days from receiving notice to the Debtor to cure a failure to make a payment under the Interim Order.

48.     Now, Debtor proposes that it be allowed thirty (30) days to cure any default under the Plan before Level One may seek the intervention of the Court.

49.     That proposal risks a substantial or continuing loss to or diminution of the estate, and importantly, of Level One's collateral, while Level One seeks the intervention of the Court to have the Debtor comply with its duties under the Plan.

50.     As such, Level One requests a default provision providing Debtor the same five (5) day grace period and five (5) days from receiving notice to the Debtor to cure a failure to make a payment under the Plan as under the Interim Order.

WHEREFORE, Creditor Level One Bank objects to the Debtors' Plan of Reorganization and respectfully requests that this Court deny confirmation and grant Level One any other relief this Court deems just and equitable.

Respectfully submitted,

DAWDA, MANN, MULCAHY & SADLER, PLC

By: */s/ Frances Belzer Wilson*
Frances Belzer Wilson (P68650)
39533 Woodward Avenue, Suite 200
Bloomfield Hills, MI 48304
(248) 642-3700
Attorneys for Creditor Level One Bank
fwilson@dmms.com

Dated: July 26, 2021

# EXHIBIT 1

# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made as of the 17th day of July, 2017, by and between LEVEL ONE BANK, a Michigan banking corporation ("Lender"), located at 32991 Hamilton Court, Farmington Hills, Michigan 48334, and LINEAR MOLD & ENGINEERING, LLC, a Michigan limited liability company ("Borrower"), located at 12926 Stark Road, Livonia, Michigan 48150.

## RECITALS

A.     Lender is providing Borrower a term loan in the Term Loan Amount (the "Term Loan"), which shall be evidenced by the Term Note, subject to the terms and conditions of this Agreement.

B.     Lender is providing Borrower a revolving line of credit in the Line of Credit Loan Amount (the "Line of Credit"), which shall be evidenced by the Line of Credit Note, subject to the terms and conditions of this Agreement.

C.     Lender is providing Borrower an equipment term loan in the Equipment Loan Amount (the "Equipment Loan"), which shall be evidenced by the Equipment Note, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1     Definition of Certain Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Account" shall mean any right of Borrower to payment for services that have been fully performed, acknowledged and accepted by the Account Debtor or from the sale or lease of goods, which goods are in accordance with the Account Debtor's specifications (if any) and delivered to and accepted by the Account Debtor, and such Borrower has possession of, or has delivered to Lender at Lender's request, shipping and delivery receipts evidencing such delivery. An Account which is at any time an Eligible Account but which later fails to meet any of the eligibility requirements shall immediately cease to be an Eligible Account.

"Account Debtor" means the person who is obligated on or under an Account.

"Affiliate" of any Person shall mean (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer or director of such Person, and (c) with respect to Lender, any entity administered or managed by Lender, or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans. A Person shall be deemed to be "controlled by" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such first Person, whether by contract, ownership of voting securities, membership interests or otherwise.

"Applicable Law" shall mean any applicable laws, rules, regulations, ordinances, judgments, orders, decrees, injunctions, arbitral awards, permits, licenses, authorizations, directions and requirements of Governmental Authorities.

"Borrowing Base Amount" shall mean an amount equal to the sum of (a) eighty percent (80%) of all Eligible Accounts plus (b) the lesser of thirty percent (30%) of Eligible Inventory or Three Hundred Thousand and 00/100 Dollars ($300,000.00).

"Borrowing Base Certificate" shall mean a certificate to be signed by Borrower certifying the accuracy of the Borrowing Base Amount in form and substance satisfactory to Lender.

"Business Day" shall mean any day other than Saturday or Sunday on which commercial banking institutions are open for business in Farmington Hills, Michigan.

"Capital Expenditures" shall mean, without duplication, any amounts paid in respect of any purchase or other acquisition for value of fixed or capital assets; provided that in no event shall Capital Expenditures include amounts expended in respect of normal repair and maintenance of plant facilities, machinery, fixtures and other like capital assets utilized in the ordinary conduct of business (to the extent such amounts would not be capitalized in preparing a balance sheet determined in accordance with GAAP).

"Capital Securities" shall mean all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Closing Date" shall mean the date on which this Agreement and all of the other Loan Documents required to be delivered concurrently with this Agreement shall have been executed and delivered to Lender, the conditions precedent to the closing of the Loans shall have been satisfied and the proceeds of the Loans shall have been disbursed to or for the benefit of Borrower.

"Collections" means payments made by Account Debtors in whatever form, including electronic payments, and any other cash, checks, drafts or similar proceeds of collateral.

"Consolidated" and "Consolidating" shall mean, when used with reference to any financial term in this Agreement, the aggregate for two or more Persons of the amounts signified by such term for all such Persons determined on a consolidated or combined, as applicable, basis in accordance with GAAP. Unless otherwise specified herein, references to Consolidated financial statements or data of a Person includes consolidation with its Subsidiaries in accordance with GAAP.

"Creditors' Rights Laws" shall mean any existing or future law of any jurisdiction, domestic of foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors, including, without limitation, Title 11 of the United States Code, as amended from time to time, and any successor statute or statutes.

"Debt Service Coverage Ratio" means as of the end of each fiscal year of Borrower, the ratio of Borrower's (i) net income plus interest expense plus depreciation plus amortization less distributions for the fiscal year then ending to (ii) actual annual debt service of Borrower.

"Discretion" means:

(a)     Lender's exercise of its (from the perspective of a secured, asset-based lender) credit judgment, in good faith, based upon Lender's consideration of any factor as the Lender, taking into account information of which Lender then has actual knowledge, believes:

        (i)     Will or reasonably could be expected to affect the value of the collateral for the Loans, the enforceability of the Lender's liens, security and collateral interests therein, or the amount which Lender would likely realize from the collateral (taking into account delays which may possibly be encountered in the Lender's realizing upon the collateral and likely expenses in connection with the enforcement of remedies and associated costs of collection);

        (ii)     Indicates that any report or financial information delivered to the Lender by or on behalf of Borrower is incomplete, inaccurate, or misleading in any material manner or was not prepared in accordance with the requirements of this Agreement;

        (iii)     Constitutes an Event of Default or indicates that an Event of Default will occur with the passage of time; and/or

        (iv)     Suggests a material increase in the likelihood that Borrower will become the subject of an insolvency proceeding.

(b)     In the exercise of its judgment, as set forth in clause (a) above, Lender also may take into account any of the following factors:

        (i)     Those included in, or tested by, the definitions of Eligible Accounts;

        (ii)     The current financial and business climate of the industry in which Borrower competes (having regard for Borrower's position in that industry);

        (iii)     Economic conditions which have a material effect on Borrower's cost structure;

        (iv)     Material Adverse Effect in Borrower's assets;

        (v)     Material Adverse Effect in Borrowing Base availability versus that which was projected; and/or

        (vi)     Such other factors as Lender reasonably determines as having a material bearing on credit risks associated with the providing of loans and financial accommodations to Borrower.

(c)     The burden of establishing the failure of the Lender to have acted in a manner consistent with Lender's exercise of Discretion will be on Borrower.

(d)     When the term "discretion" (as opposed to the capitalized term Discretion) is used in any Loan Document, the term is intended to mean Lender's sole discretion, unfettered and without any limitations or conditions.

"Dividend" shall mean a payment made, liability incurred, or other consideration given by any Person (other than any stock dividend or stock split payable solely in Capital Securities of that Person) for the purchase, acquisition, redemption or retirement of any Capital Securities of that entity or as a dividend, return of capital, or other distribution in respect of that Person's Capital Securities.

"Eligible Account" and "Eligible Accounts" means Borrower's Accounts listed on Borrowing Base Certificates delivered to Lender and which Lender, in its Discretion, determines to be an Eligible Account. Without limiting the generality of the immediately preceding sentence, no Account will be an Eligible Account unless it meets all of the following minimum requirements:

(a)     The Account is valued at its face amount and represents a complete, bona fide transaction for Inventory sold, delivered, and accepted by the Account Debtor or for services rendered (but excluding any amounts in the nature of a service charge added to the amount due on an invoice because the invoice has not been paid when due) that requires no further act under any circumstances on the part of Borrower or any other person or entity to make the Account payable by the Account Debtor, and the Account arises from an arm's-length transaction in the ordinary course of Borrower's business between Borrower and an Account Debtor that is not an Affiliate, partner, officer, or employee of Borrower, or a member of the family of any partner, officer, or employee of Borrower.

(b)     The Account is not unpaid more than the earlier of (A) 60 days past the date the payment is due per the invoice terms or the terms of the underlying purchase order or agreement, or (B) 90 days from the earlier of (i) the date on which the original invoice rendered in connection with such Account was issued, or (ii) the date on which the Inventory was shipped to the Account Debtor or the services performed.

(c)     If the Account arises from the sale of Inventory, the Inventory was shipped or delivered or provided to the Account Debtor on a final sale basis and not on a bill and hold sale basis, a consignment sale basis, a guaranteed sale basis, a sale or return basis, or on the basis of any other similar understanding, and no part of the Inventory has been returned or rejected.

(d)     The Account is not evidenced by chattel paper or an instrument of any kind.

(e)     The Account Debtor with respect to the Account (A) is not insolvent, (B) is not the subject of any bankruptcy or insolvency proceedings of any kind or of any other proceeding or action, threatened or pending, which might have a materially adverse effect on its business, and (C) is not, in Lender's Discretion, deemed ineligible for credit for other reasons (including, without limitation, unsatisfactory past experience of Borrower or Lender with the Account Debtor).

W:\DATA\CLDOCS\0628R\0191\01625482.DOCX

(f)     The Account Debtor is located in the United States of America and is not a foreign Account.

(g)     The Account Debtor is not an Affiliate of Borrower.

(h)     (i) The Account Debtor is not the government of the United States of America or any other government, or any department, agency or instrumentality thereof, or (ii) if the Account Debtor is an entity mentioned in the preceding clause, the Federal Assignment of Claims Act (or applicable similar legislation applicable to any other government, department, agency or instrumentality) has been fully complied with so as to validly perfect Lender's first-priority security interest to Lender's satisfaction.

(i)     The Account is a valid, legally enforceable obligation of the Account Debtor with respect thereto and is not subject to any dispute, condition, contingency, setoff, recoupment, reduction, claim for credit, allowance, adjustment, counterclaim or defense on the part of the Account Debtor and no fact exists that may provide a basis for any of the foregoing in the present or future (collectively, a "Setoff");

(j)     The Account is subject to a first-priority security interest in Lender's favor and is not subject to any other lien, claim, encumbrance, or security interest whatsoever.

(k)     The Account is evidenced by an invoice or other documentation in form acceptable to Lender and arises from a contract or purchase order that is satisfactory in form and substance to Lender.

(l)     Borrower has observed and complied with (A) all laws of the United States of America (including the Fair Labor Standards Act) and (B) all laws of the state in which the Account Debtor or the Account is located which, if not observed and complied with, would deny to Borrower access to the courts of that state.

(m)     No representation or warranty contained in this Agreement or any other agreement between Borrower and Lender or in any Borrowing Base Certificate with respect to the Account has been breached in any material respect.

(n)     The Account is not subject to any provision prohibiting its assignment.

(o)     The Account does not represent any manufacturer's or supplier's credits, discounts, incentive plans, or other similar arrangements entitling Borrower to discounts on future purchases.

(p)     The Inventory giving rise to the Account was not, at the time of sale thereof, subject to any lien or encumbrance except in Lender's favor.

(q)     The Account is payable in U.S. Dollars.

In addition to the foregoing requirements:

(i)     Accounts of any Account Debtor that are otherwise eligible will be reduced to the extent of any accounts payable (including, without limitation, Lender's good faith estimate of any contingent liabilities) by Borrower to the Account Debtor ("Contras") and any customer deposits (provided that Lender, in

its Discretion may determine that none of the Accounts are Eligible Accounts if aggregate Contras and Setoffs represent 10% or more of the total amount owing to Borrower from the Account Debtor);

(ii)    Accounts of any Account Debtor that are otherwise eligible will be reduced to the extent of any accounts payable representing a retainage or holdback by the Account Debtor;

(iii)    All Accounts owing by a given Account Debtor will be ineligible if more than 25% of the total Accounts owing by the Account Debtor have been unpaid for 90 days or more;

(iv)    All Accounts owing by a given Account Debtor will be ineligible if more than 50% of the total Accounts owing by the Account Debtor are otherwise ineligible; and

(v)    All Accounts owing by a given Account Debtor will be ineligible if more than 50% of the total Accounts owing by the Account Debtor are otherwise ineligible;

(vi)    Accounts of any Account Debtor will be ineligible to the extent that the total unpaid amount of the Accounts, when added together with all other Accounts due to Borrower from the Account Debtor and its Affiliates, exceeds twenty-five percent (25%) of all Accounts of Borrower, collectively; and

(vii)    Any Account that is at any time an Eligible Account and that subsequently fails to meet any of the requirements set forth above will immediately cease to be an Eligible Account and must be removed from the Borrowing Base immediately.

"Eligible Equipment" means new or used Equipment that (a) is owned by Borrower free of all encumbrances and security interest and is not Equipment subject to a vendor's purchase money security interest or Equipment held by Borrower on consignment, (b) no financing statement is on file covering it or its products or proceeds, except in favor of Lender, (c) if it is represented, or covered by documents of title, Borrower is the owner of the documents free of all encumbrances and security interests and such documents of title have been assigned to, and are in possession of, Lender, (d) is in good condition and not purchased or held for sale, (e) has been acquired by Borrower, (f) has been delivered from the manufacturer thereof (or its selling agent), (g) is to be used and operated by Borrower in the conduct of its business, (h) is purchased by Borrower after the date of execution hereof with the proceeds of the Equipment Loan, and (i) Lender has been granted and has a valid, enforceable first, prior and perfected security interest and lien priority with respect thereto, including all proceeds.

"Eligible Inventory" means that portion of Borrower's Inventory consisting of raw materials, WIP or finished goods held by Borrower for sale in the ordinary course of Borrower's business which is listed on a Borrowing Base Certificate delivered to Lender in accordance with this Agreement that Lender, in its Discretion, determines to be Eligible Inventory. Without limiting the generality of the immediately preceding sentence, Inventory will not be Eligible Inventory unless it meets all the following minimum requirements:

6

(a)     The Inventory has not been shipped, delivered, provided to, purchased or sold by Borrower on a bill and hold, consignment sale, guaranteed sale, or sale or return basis, or any other similar basis or understanding.

(b)     No Account has arisen with respect to the Inventory.

(c)     The Inventory has not been billed to a customer on a "progress billing", "pre-billing" or similar basis prior to shipment to the customer.

(d)     The Inventory is valued at the lower of cost or market, on a first-in, first-out (FIFO) basis.

(e)     The Inventory is in Borrower's possession, or if the Inventory is being stored or processed and is not located on premises owned by Borrower, the landlord or owner has executed an acceptable Collateral Access Agreement or Bailee Agreement, as applicable.

(f)     The Inventory is not subject to any royalty, copyright, trademark, trade name, or licensing arrangement, or any law, rule, or regulation that could limit or impair Lender's ability to exercise its rights with respect to the Inventory.

(g)     The Inventory is not packaging, labels or supplies.

(h)     The Inventory meets all standards imposed by any governmental or agency, department, or division having regulatory authority over the Inventory or its use or sale including, without limitation, standards set forth in the Fair Labor Standards Act.

(i)     No representation or warranty in this Agreement, any other agreement between Borrower and Lender, or any Borrowing Base Certificate has been breached, in any material respect, with respect to the Inventory.

(j)     The Inventory is not obsolete or slow moving (in excess of a 12 month supply based on historic usage or sales), is of good and merchantable quality, and is readily salable on the open market in the ordinary course of Borrower's business.

(k)     The Inventory is subject to a first-priority security interest in Lender's favor and is not subject to any other lien or encumbrance.

Any Inventory that is at any time Eligible Inventory and that subsequently fails to meet any of the requirements set forth above will cease to be Eligible Inventory immediately and must be removed from the Borrowing Base immediately.

"Environmental Laws" shall mean all laws, statutes, ordinances, rules, regulations, orders, and determinations of any Governmental Authority pertaining to health, hazardous substances, natural resources, conservation, wildlife, pollution or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Clean Air Act, as amended, 42 U.S.C. §7401 et seq., the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §5101 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §1321 et seq., the Emergency Planning and Community Right to Know Act, 42 U.S.C. 11001 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq. and any state counterparts.

"Equipment" means equipment as defined in Article 9 of the UCC.

"Equipment Loan" is defined in Recital C of this Agreement.

"Equipment Loan Amount" shall mean up to Two Million and 00/100 Dollars ($2,000,000.00).

"Equipment Note" shall mean the promissory note executed by Borrower to evidence the Equipment Loan, together with any and all modifications and amendments thereto and any note issued in substitution or replacement therefore.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, or any successor act or code.

"Event of Default" shall mean any of the events specified in Section 7.1.

"GAAP" shall mean generally accepted accounting principles of the United States, consistently applied, subject to fiscal year-end adjustments with respect to any interim financial statements or reports.

"Governmental Authority" shall mean any court, board, agency, commission, office, instrumentality, or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city, or otherwise), whether now or hereafter in existence, having jurisdiction over Borrower or the property of Borrower, including the Mortgaged Property.

"Guarantee Obligation" shall mean as to any Person (the "guaranteeing person") (a) any obligation of the guaranteeing person or (b) any obligation of another Person (including, without limitation, any bank under any letter of credit), the creation of which was induced by a reimbursement, counter indemnity or similar obligation issued by the guaranteeing person, in either case guaranteeing or in effect guaranteeing any Debt, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

8

"Hazardous Materials" shall mean any substance that is defined or listed as a hazardous, toxic, or dangerous substance, pollutant, contaminant, material or waste, and any other constituent thereof, whether liquid, solid, semisolid, sludge and/or gaseous, under any Environmental Law or is otherwise regulated or prohibited or subject to investigation or remediation under any Environmental Law because of its hazardous, toxic or dangerous properties, including (i) any substance that is a "hazardous substance" under applicable Environmental Law, and (ii) chemicals, compounds, by-products, pesticides, asbestos containing materials, petroleum or petroleum products (including gasoline, oil and diesel fuel) and polychlorinated biphenyls, radioactive materials, biologically hazardous materials (including mold, fungi, bacteria or other biological contaminants) and hazardous and non-hazardous wastes.

"Head Office" shall mean Lender's headquarters, located at 32991 Hamilton Court, Farmington Hills, Michigan 48334, or such other location as Lender may designate by providing Borrower with not less than ten (10) days' prior written notice.

"Insurance Policies" shall mean the following insurance policies, in each case acceptable to Lender:

(a)     Commercial General Liability Insurance for owners, including blanket contractual liability, products and completed operations, personal injury (including employees), independent contractors, explosion, collapse and underground hazards for bodily injury and property damage not less than One Million Dollars ($1,000,000) arising out of any single occurrence and Two Million Dollars ($2,000,000) in the aggregate;

(b)     Workers' Compensation Insurance for statutory limits;

(c)     Such other insurance as is required by any other Loan Document or as Lender may otherwise reasonably require.

All Insurance Policies shall be "occurrence" based policies, issued on forms, by companies and in amounts satisfactory to Lender. All insurance policies shall contain loss-payable clauses in favor of Lender and its successors and assigns, as loss payee under a Lender's loss payable endorsement or mortgagee, as applicable, together with a non-contributing mortgagee clause acceptable to Lender. All policies of liability insurance shall name Lender and its successors and assigns as additional insureds. All insurance policies and certificates of insurance provided to Lender shall require (30) days' prior written notice of cancellation or material diminution in coverage. Borrower may satisfy the insurance requirements of this Agreement and the other Loan Documents by using "blanket" policies which cover the Mortgaged Property (or the other risks required to be insured hereby or thereby) and other properties or risks of Borrower, provided that any such blanket policy shall comply with the specific requirements set forth herein or therein.

"Inventory" shall have the meaning given such term in the UCC.

"Line of Credit" is defined in Recital B of this Agreement.

"Line of Credit Loan Amount" shall mean up to Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00).

"Line of Credit Availability" shall mean the lesser of: (a) the Line of Credit Loan Amount and (b) the Borrowing Base Amount.

9

"Line of Credit Note" shall mean the promissory note executed by Borrower to evidence the Line of Credit, together with any and all modifications and amendments thereto and any note issued in substitution or replacement therefore.

"Loans" shall mean the Term Loan, the Line of Credit, and the Equipment Loan, and "Loan" shall mean either of them, as applicable.

"Loan Documents" shall mean, collectively, this Agreement, the Notes, the Mortgage, the Security Agreements, and any supporting applications, any swap agreements, derivative agreements, interest rate protection agreements or similar agreements entered into by Borrower with Lender or any Affiliate of Lender, and any other document, instrument or agreement evidencing or securing the Loans, together with any and all modifications and amendments to any of the foregoing.

"Material Adverse Effect" shall mean a material, adverse effect on (i) the business, property or condition (financial or otherwise) of Borrower or any Subsidiary; (ii) Borrower's or any Subsidiary's ability to perform its obligations hereunder or any other Loan Document to which it is a party, (iii) the perfection or priority of any lien granted to Lender pursuant to this Agreement or any other Loan Document, including, without limitation, the Mortgage, or (iv) the validity or enforceability of this Agreement or any other Loan Document.

"Material Agreements" shall mean each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Mortgaged Property, as to which either (i) there is an obligation of Borrower to pay more than $50,000.00 per annum; or (ii) the term thereof extends beyond one year (unless cancelable on thirty (30) days' or less notice without requiring the payment of termination fees or payments of any kind).

"Material Alteration" shall mean any alteration affecting the Mortgaged Property (i) the cost of which exceeds ten percent (10%) of the outstanding principal balance of the Loans, or (ii) which adversely affects any material structural components of the Mortgaged Property or any major building system, including, without limitation, any HVAC system; provided, however, in no event shall any emergency repairs or any tenant improvement work performed pursuant to a lease approved by Lender constitute a Material Alteration.

"Mortgage" shall mean a mortgage in form and substance satisfactory to Lender on each Mortgaged Property granted by the mortgagor thereof to Lender.

"Mortgaged Property" shall mean the real property located at 12926 Stark Road, Livonia, Michigan 48150.

"Notes" shall mean the Term Note, the Line of Credit Note, and the Equipment Note, and "Note" shall mean any of them, as applicable.

"Obligations" shall mean, collectively, Borrower's obligations for the payment of all sums advanced or to be advanced hereunder, together with interest on the outstanding principal balance of such sums and with any and all other sums payable by Borrower to Lender pursuant to this Agreement, the Note or any other Loan Document, and payment and performance of all of the warranties, representations, covenants and agreements to be paid, fulfilled, observed and performed by Borrower under each Loan Document to which Borrower is a party.

10

"Participation" shall mean a participation interest in the Loans sold by the Lender to another lending party.

"PBGC" shall mean the Pension Benefit Guaranty Corporation, or any successor thereto.

"Person" shall mean an individual, partnership, corporation, limited liability company, trust, unincorporated association, or other entity or association.

"Permitted Liens" shall mean with respect to any Person:

    (a)    liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by proceedings diligently pursued; and

    (b)    any other lien, encumbrance or charge acceptable to and approved in writing by Lender, including pursuant to this Agreement and the other Loan Documents.

"REA" shall mean, individually or collectively (as the context may require), each reciprocal easement, covenant, condition, restriction agreement, or similar agreement affecting the Mortgaged Property, whether now existing or hereafter entered into.

"Regulatory Change" shall mean any change, effective after the date of closing the Loan, in United States federal or state laws or regulations (including Regulation D and capital adequacy regulations) or foreign laws or regulations or the adoption or making after such date of any interpretations, directives or requests applying to a class of banks which includes Lender, under any United States federal or state or foreign laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof.

"Security Agreements" shall mean the security agreements executed by Borrower in favor of Lender as security for the Loans.

"Subsidiary(ies)" shall mean, in respect of any Person, any corporation, association, joint stock company, limited liability company, partnership (whether general, limited or both), or business trust (in any case, whether now existing or hereafter organized or acquired), of which more than fifty percent (50%) of the outstanding voting Capital Securities or other ownership interest is owned either directly or indirectly by such Person and/or one or more of its Subsidiaries, or the management of which is otherwise controlled either directly or indirectly by such Person and/or one or more of its Subsidiaries. Unless otherwise specified to the contrary herein or the context otherwise expressly requires, the term Subsidiary(ies) shall refer to the Subsidiary(ies) of Borrower.

"Term Loan" is defined in Recital A of this Agreement.

"Term Loan Amount" shall mean One Million and 00/100 Dollars ($1,000,000.00).

"Term Note" shall mean the promissory note executed by Borrower to evidence the Term Loan, together with any and all modifications and amendments thereto and any note issued in substitution or replacement therefore.

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

"UCC" shall mean the Uniform Commercial Code in effect in the State of Michigan from time to time.

1.2    Accounting Terms. Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP. Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to Lender pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with sound accounting practices and GAAP as in effect on the date of this Agreement.

1.3    Other Terms Defined in UCC. All other capitalized words and phrases used in this Agreement and not otherwise specifically defined in this Agreement shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined in the UCC.

## ARTICLE 2.
## THE LINE OF CREDIT

2.1    Loan. Lender agrees to make advances under the Line of Credit upon the terms, covenants and conditions set forth in this Agreement and in the Line of Credit Note. The Line of Credit shall be in the Line of Credit Loan Amount and shall accrue interest, mature and be repaid as set forth in the Line of Credit Note. Aggregate advances under the Line of Credit shall not exceed the Line of Credit Availability.

2.2    Commitment. Provided no Event of Default exists that has not been cured or waived, Lender agrees to make advances of the Line of Credit to or for the benefit of Borrower up to an amount equal to Line of Credit Availability, subject to the terms of this Agreement and the Line of Credit Note. Any amounts advanced and repaid by Borrower under the Line of Credit may thereafter be re-advanced by Lender to Borrower, subject to the terms of this Agreement and the Line of Credit Note.

2.3    Use of Proceeds: Borrower may use the proceeds of the Line of Credit for working capital and for no other purpose.

2.4    Interest.

(a)    Interest Rate. The outstanding principal balance of the Line of Credit shall bear interest as set forth in the Line of Credit Note and interest shall be computed, assessed and payable as set forth in the Line of Credit Note.

(b)    Interest on Overdue Payments of Notes; Default Interest Rate. If any payment of principal or interest on any Note is not paid when due or prior to the expiration of the applicable period of grace (if any) therefor, Lender may charge and collect a late charge as set forth in the applicable Note. No failure by Lender to charge or collect any late charge in respect of any delinquent payment shall be considered to be a waiver of any rights that Lender may have under this Agreement, including without limitation the right later to impose a late charge for such delinquent payment or to take such other action as may then be available to it under this Agreement, or at law or in equity. If any Note has been accelerated or if an Event of Default shall have occurred and be continuing, the outstanding principal balance of the Notes, together with all accrued interest thereon, and any and all other Obligations not evidenced by a Note, shall bear interest from the date on which such amount shall have first become due and payable to the date on which such amount shall be paid (whether before or after judgment) at the default interest rate set forth in the applicable Note. Interest at the default interest rate will continue to accrue until the Obligations in respect of such payment are discharged (whether before or after judgment).

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

2.5     Repayment; Prepayment. The Line of Credit shall be repaid as set forth in the Line of Credit Note, and may be prepaid as set forth in the Line of Credit Note. If the aggregate outstanding principal balance of the Line of Credit exceeds the Line of Credit Availability, Borrower shall, without notice or demand of any kind, immediately make such repayments of the Line of Credit or take such other action as is satisfactory to Lender to eliminate such excess.

2.6     Promissory Note. Borrower will evidence its obligation to repay the Line of Credit by executing and delivering to Lender the Line of Credit Note, dated of even date herewith.

**ARTICLE 2.A**
**THE TERM LOAN**

2.A.1     Term Loan. Lender agrees to loan to Borrower and Borrower agrees to borrow, on the date of execution of this Agreement, a sum equal to the Term Loan Amount. The Term Loan shall be in the Term Loan Amount and shall accrue interest, mature and be repaid as set forth in the Term Note. The loan under this Article 2.A shall be subject to the terms and conditions of this Agreement and the Term Note.

2.A.2     Interest. The outstanding principal balance of the Term Loan shall bear interest as set forth in the Term Note, and interest shall be computed, assessed and payable as set forth in the Term Note. Interest on overdue payments and interest accruing during an Event of Default shall be payable as provided in Section 2.4(b).

2.A.3     Repayment; Prepayment. The indebtedness represented by the Term Note shall be repaid as set forth in the Term Note. Borrower may prepay the Term Note only as set forth in the Term Note.

2.A.4     Use of Proceeds: Borrower may use the proceeds of the Term Loan to purchase the Mortgaged Property and for no other purpose.

**ARTICLE 2.B**
**THE EQUIPMENT LOAN**

2.B.1     Equipment Loan. Lender agrees to make advances under the Equipment Loan upon the terms, covenants and conditions set forth in this Agreement and in the Equipment Note. The Equipment Loan shall be in the Equipment Loan Amount and shall accrue interest, mature and be repaid as set forth in the Equipment Note. Aggregate advances under the Equipment Loan shall not exceed the Equipment Loan Amount.

2.B.2     Commitment. Provided no Event of Default exists that has not been cured or waived, Lender agrees to advance the Equipment Loan to or for the benefit of Borrower up to the Equipment Loan Amount, subject to the terms of this Agreement and the Equipment Note. The Equipment Loan Amount shall be limited to eighty percent (80%) of the fair market appraised value of the Eligible Equipment. The determination of such costs/value shall be based upon invoices, appraisals or other documentation as Lender may require. Each advance requested by Borrower under the Equipment Loan must be accompanied with a copy of the invoice for the proposed Equipment to be purchased. Lender may, at its discretion, require a separate UCC to be filed for each specific piece of Equipment purchased with monies advanced under the Equipment Loan. Any amounts advanced and repaid by Borrower under the Line of Credit may not be re-advanced by Lender to Borrower.

2.B.3.     Use of Proceeds. Borrower may use the proceeds of the Equipment Loan to purchase Eligible Equipment and for no other purpose.

13

2.B.4    Interest. The outstanding principal balance of the Equipment Loan shall bear interest as set forth in the Equipment Note, and interest shall be computed, assessed and payable as set forth in the Equipment Note. Interest on overdue payments and interest accruing during an Event of Default shall be payable as provided in Section 2.4(b).

2.B.5    Repayment; Prepayment. The Equipment Loan shall be repaid as set forth in the Equipment Note, and may be prepaid as set forth in the Equipment Note. If the aggregate outstanding principal balance of the Equipment Loan exceeds the Equipment Loan Amount, Borrower shall, without notice or demand of any kind, immediately make such repayments of the Equipment Loan or take such other action as is satisfactory to Lender to eliminate such excess.

2.B.6    Promissory Note. Borrower will evidence its obligation to repay the Equipment Loan by executing and delivering to Lender the Equipment Note, dated of even date herewith.

## ARTICLE 3.
## ADDITIONAL COSTS; INDEMNIFICATION

3.1    Additional Costs; Regulatory Change.

(a)    Notwithstanding any conflicting provision of this Agreement to the contrary, if any Applicable Laws not in effect as of the date hereof shall (i) subject Lender to any tax, levy, impost, duty, charge, fee, deduction or withholding of any nature with respect to any Loan, this Agreement, any Note, or any other Loan Document or the payment by Borrower of any amounts payable to Lender with respect to any Loan, this Agreement, any Note, or any other Loan Document; or (ii) materially change, in the reasonable opinion of Lender, the basis of taxation of payments to Lender of the principal of or the interest on any Note or any other amounts payable to Lender under this Agreement or any other Loan Document; or (iii) impose or increase, or render applicable, any special or supplementary special deposit or reserve or similar requirements against assets held by, or deposits in or for the account of, or any eligible liabilities of, or loan by any office or branch of Lender; or (iv) impose on Lender any other condition or requirement with respect to this Agreement, any Note or any other Loan Document, and if the result of any of the foregoing is (A) to increase the cost to Lender of making, funding or maintaining all or any part of the principal of any of the Loans, or (B) to reduce the amount of principal, interest or any other sum payable by Borrower to Lender under this Agreement, any Note or any other Loan Document, or (C) to require Lender to make any payment or to forego any interest or other sum payable by Borrower to Lender under this Agreement, any Note or any other Loan Document, the amount of which payment or foregone interest or other sum is measured by or calculated by reference to the gross amount of any sum receivable or deemed received by Lender from Borrower under this Agreement, any Note or any other Loan Document, then, and in each such case, Borrower will pay to Lender, within ten (10) days of written notice, such additional amounts as will (in the reasonable opinion of Lender) be sufficient to compensate Lender for such additional cost, reduction, payment or foregone interest or other sum. Anything in this paragraph to the contrary notwithstanding, the foregoing provisions of this paragraph shall not apply in the case of any additional cost, reduction, payment or foregone interest or other sum resulting solely from or arising solely as a consequence of any taxes charged upon or by reference to the overall net income, profits or gains of Lender.

(b)    If any present or future Applicable Law shall make it unlawful for Borrower to perform any of its agreements or obligations under this Agreement, any Note or any other Loan Document, and Lender shall reasonably determine (which determination shall be conclusive and binding on Borrower) (i) that as a consequence of the effect or operation (whether direct or

14

indirect) of any such Applicable Law, any of the rights, remedies, powers or privileges of Lender under or in respect of this Agreement, any Note or any other Loan Document shall be or become invalid, unenforceable, or materially restricted; and (ii) that any of the rights, remedies, powers and privileges so affected are of material importance to Lender (as determined by Lender), then Lender may, by giving notice to Borrower, declare all of the Obligations, including without limitation the entire unpaid principal of the Notes, all of the unpaid interest accrued on the Notes and any and all other sums due and payable by Borrower to Lender under this Agreement, the Notes and any other Loan Document, to be immediately due and payable, and, thereupon, such Obligations shall (if not already due and payable) forthwith become and be due and payable without further notice or other formalities of any kind, all of which are hereby expressly waived by Borrower.

3.2     Indemnification for Losses.  Without derogating from any of the other provisions of this Agreement or any other Loan Document, Borrower hereby absolutely and unconditionally agrees to indemnify Lender, upon demand at any time and as often as the occasion therefor may require, against any and all claims, demands, suits, actions, damages, losses, costs, expenses and all other liabilities whatsoever which Lender or any of Lender's past, present and future officers, directors, shareholders, employees, representatives and consultants may sustain or incur as a consequence of (a) any failure by Borrower to pay any amount payable under this Agreement, any Note or any other Loan Document as and when such amount shall first have become due and payable (giving effect, however, to expiration of the period of grace (if any) applicable thereto), or (b) the acceleration of the maturity of any of the Obligations, or (c) any failure by Borrower to perform or comply with any of the terms and provisions of this Agreement, any Note or any other Loan Document to which Borrower is a party.  Such claims, demands, suits, actions, damages, losses, costs or expenses shall include, without limitation (a) any costs incurred by Lender in carrying funds to cover any overdue principal, overdue interest or any other overdue sums payable by Borrower under this Agreement, any Note, or any other Loan Document; (b) any interest payable by Lender to the lenders of the funds borrowed by Lender in order to carry the funds referred to in clause (a) of this Section; and (c) any losses (but excluding losses of anticipated profit) incurred or sustained by Lender in liquidating or re-employing funds acquired from third parties to make, fund or maintain all or any part of the Loans.

3.3     Statements by Lender.  A statement signed by an officer of Lender setting forth any additional amount required to be paid by Borrower under Sections 3.1 or 3.2 of this Agreement shall be submitted by Lender to Borrower in connection with each demand made at any time by Lender under either such Section.  A claim by Lender for all or any part of any additional amounts required to be paid by Borrower under such Sections may be made before or after any payment to which such claim relates.  Each such statement shall, in the absence of manifest error, constitute conclusive evidence of the additional amount required to be paid to Lender.

## ARTICLE 4.
## CONDITIONS PRECEDENT

4.1     General.  Lender shall not be required to consummate the transactions contemplated by this Agreement or to disburse the proceeds of any of the Loans unless the conditions set forth in this Article 4 shall have been completed to Lender's satisfaction.

(a)     Borrower shall have executed the Loan Documents and shall have delivered the same to Lender, and shall have caused each Mortgage to be executed and delivered to Lender.  All of the Loan Documents shall be in full force and effect.

15

(b)      Borrower shall have provided Lender with a certificate from a duly authorized representative of Borrower: (i) attaching true and complete copies of Borrower's Articles of Incorporation and Bylaws or Articles of Organization and Operating Agreement, as applicable, and certifying that the same are in full force and effect and unmodified; (ii) attaching a resolution authorizing Borrower's execution and delivery of this Agreement and the other Loan Documents to which Borrower is a party and its performance of its obligations under this Agreement and the other Loan Documents, and confirming that such resolution is in full force and effect; and (iii) identifying the officers, members or managers of Borrower who are authorized to execute and deliver the Loan Documents for and on behalf of Borrower, and providing specimen signatures for such officers;

(c)      With respect to the Mortgaged Property, the owner thereof shall have provided Lender with a duly executed Mortgage providing for a fully perfected mortgage lien, in favor of Lender, in all right, title and interest of such owner in such real property, together with the following, all in form and substance satisfactory to Lender:

(i)      an ALTA Loan Title Insurance Policy, issued by an insurer acceptable to Lender, insuring Lender's lien on such real property and containing such endorsements as Lender may require (it being understood that the amount of coverage, exceptions to coverage and status of title set forth in such policy shall be acceptable to Lender);

(ii)      copies of all documents of record concerning such real property as shown on the commitment for the ALTA Loan Title Insurance Policy referred to above;

(iii)      evidence of insurance, including without limitation, casualty and public liability insurance, as required to be maintained with respect to the Mortgaged Property by this Agreement, the Mortgage or any other Loan Document;

(iv)      if requested by Lender, an ALTA survey certified to Lender and such title insurer referred to above, meeting such standards as Lender may establish;

(v)      an environmental site assessment report, the nature and scope of which is reasonably satisfactory to Lender, and prepared by environmental engineers reasonably satisfactory to Lender;

(vi)      a flood insurance policy concerning such real property, if required by the Flood Disaster Protection Act of 1973; and

(vii)      an appraisal, prepared by an independent appraiser engaged directly by Lender, as deemed satisfactory by Lender.

(d)      Each Guarantor that is not an individual shall have provided Lender with a certificate of its existence and authority authorizing such Guarantor's execution and delivery of the Guaranty and such other Loan Documents to which it is a party; and

(e) Borrower shall have paid all costs and expenses of Lender in connection with this Agreement or the closing of the transactions contemplated hereby including, without limitation, reasonable attorneys' fees, unless otherwise waived by Lender.

4.2 Conditions for the Benefit of Lender. All of the foregoing conditions are imposed for the benefit of Lender. No party other than Lender shall have standing to require the satisfaction of any such conditions, and no party shall be entitled to assume that Lender would refuse to make advances of Loan proceeds if any one or more of such conditions were to remain unfulfilled. No party other than Lender shall be or be deemed to be the beneficiary of any such conditions; any one or more, or all, of such conditions may be waived if Lender, in its sole discretion, shall deem it advisable to do so.

**ARTICLE 5.**
**GENERAL REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants to Lender, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and thereafter, so long as any Obligations remain unpaid and outstanding:

5.1 Organization and Existence.

(a) Borrower (i) is duly organized, validly existing and in good standing as a corporation or limited liability company, as applicable, under the laws of the State of Michigan; (ii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iii) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents.

(b) Borrower has provided Lender with true, correct and complete copies of its Articles of Incorporation and Bylaws or Articles of Organization and Operating Agreement, as applicable, and all of the exhibits thereto (collectively, "Borrower's Organizational Documents"). All of Borrower's Organizational Documents are unmodified and in full force and effect.

(c) At Lender's request, each Subsidiary shall provide Lender with true, correct and complete copies of its Articles of Incorporation and Bylaws or Articles of Organization and Operating Agreement and all of the exhibits thereto (collectively, each "Subsidiary's Organizational Documents"). Each Subsidiary's Organizational Documents are unmodified and in full force and effect.

5.2 Due Authorization.

(a) The execution and delivery by Borrower of this Agreement and the other Loan Documents to which Borrower is a party, the performance by Borrower of all of its agreements and obligations under such documents and the making of the borrowings contemplated by this Agreement have been duly authorized by all necessary action on the part of Borrower and do not and will not (i) contravene any provision of Borrower's Organizational Documents; (ii) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien (other than those in favor of Lender pursuant to the Loan Documents) upon any of its property under any agreement, indenture, mortgage or other instrument to which Borrower is a party or by which Borrower is bound or affected; (iii) violate or contravene any provision of any law, rule or regulation (including, without limitation, the

Regulations of the Board of Governors of the Federal Reserve System) or any order, ruling or interpretation thereunder or any decree, order or judgment of any court or governmental or regulatory authority, bureau, agency or official binding on Borrower; or (iv) require any waivers, consents or approvals by any of the creditors or trustees for creditors of Borrower.

(b)      Intentionally Omitted.

(c)      Except as to matters which Borrower has procured, obtained or performed prior to or concurrently with its execution and delivery of this Agreement, no approval, consent, order, authorization or license by, or giving notice to, or taking any other action with respect to, any Governmental Authority is required under any provision of any Applicable Law:

(i)      for Borrower's execution and delivery of this Agreement and the other Loan Documents to which it is a party or Borrower's performance of its obligations under this Agreement and the other Loan Documents and the borrowings contemplated by this Agreement; or

(ii)      for the continuing legality, validity, binding effect, enforceability or admissibility in evidence of this Agreement and the other Loan Documents.

5.3      <u>Material Adverse Effect</u>. There are no actions, suits or proceedings pending or, to the actual knowledge of Borrower, threatened against Borrower or any Subsidiary, which could, if determined adversely to Borrower or such Subsidiary, reasonably be expected to have a Material Adverse Effect upon Borrower or such Subsidiary.

5.4      <u>Loan Documents</u>.

(a)      On or before the Closing Date, Borrower will have duly executed and delivered each of the Loan Documents to which it is a party, and each such Loan Document will be in full force and effect. Each Loan Document to which Borrower is a party shall constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting the enforcement of creditor's rights). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or any other Person, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(b)      The execution, delivery and performance of the Loan Documents by Borrower and its Subsidiaries and the borrowing evidenced by the Notes and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or other Governmental Authority, any license, certificate or other approval required to operate the Mortgaged Property, Borrower's Organizational Documents or such other party's organizational documents, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except Permitted Liens; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the Mortgage in appropriate land

18

records and except for Uniform Commercial Code filings relating to the security interest created hereby or by the Security Agreement).

5.5 <u>No Default</u>. No event has occurred and is continuing, and no condition exists, which constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default. Borrower has no right to rescind, cancel or terminate this Agreement or any other Loan Document.

5.6 <u>Financial Statements</u>. All of the financial statements of Borrower and each Subsidiary delivered to Lender in connection with the transactions contemplated by this Agreement have been prepared in accordance with GAAP, and fairly present in all material respects the financial condition of Borrower and such Subsidiary as of the dates on which the same were prepared. There are no material liabilities or obligations, secured or unsecured (whether accrued, absolute or actual, contingent or otherwise), not reflected in such financial statements, which, in accordance with GAAP, should have been reflected therein. From the date of the most recent financial statements provided to Lender until the date hereof, there has been no Material Adverse Effect on the financial condition of Borrower or any Subsidiary.

5.7 <u>Tax Returns</u>. Each of Borrower and each Subsidiary has filed all federal, state and other tax returns required to be filed in respect of all taxing periods prior to the date of this Agreement (or has been granted extensions with respect to same), and has paid or made reasonable provision, in accordance with Applicable Laws for the payment of all taxes (if any) which have or may become due and payable pursuant to any such returns (or pursuant to any matters raised by audits). Each of Borrower and each Subsidiary has paid or caused to be paid all real and personal property taxes and assessments and other governmental charges lawfully levied or imposed on or against Borrower or such Subsidiary or its property (other than those presently payable without payment of interest or penalty and those which are subject to contests initiated in good faith and diligently prosecuted and as to which adequate reserves have been provided).

5.8 <u>Financial Condition</u>.

(a) Borrower is solvent, and, giving effect to the closing of the transactions contemplated by this Agreement and the disbursement of the proceeds of the Loans, Borrower shall remain solvent.

(b) No petition in bankruptcy or proceeding under any Creditors' Rights Laws with respect to Borrower has been filed or initiated.

5.9 <u>Business Loan</u>. The Loans are intended solely for business purposes, and no proceeds of the Loans shall be used for personal, family or household purposes.

5.10 <u>Locations</u>. Schedule 5.10 sets forth all locations (whether owned or leased) at which Borrower conducts business or at which Borrower's assets are located.

5.11 <u>Status of Mortgaged Property</u>.

(a) The Mortgaged Property, and the present and future use and occupancy thereof, are in full compliance with Applicable Laws. Borrower has obtained (i) all necessary certificates, licenses, permits, and other approvals, from Governmental Authorities and permits, necessary for the ownership and operation of the Mortgaged Property and the conduct of Borrower's business, and (ii) all required zoning, building code, land use, environmental and other similar

19

permits or approvals, all of which are in full force and effect as of the date hereof and are not subject to revocation, suspension, forfeiture or modification.

(b)     The Mortgaged Property is in good condition, order, and repair in all material respects; there exists no structural or other material defects or damages in the Mortgaged Property, latent or otherwise; and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Mortgaged Property, or any part thereof, which would adversely affect the insurability thereof or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any insurance policy or bond.

(c)     All costs and expenses of all labor, materials, supplies, and equipment used in the construction of any improvements upon the Mortgaged Property have been paid in full. There are no mechanics' or similar liens or claims which have been filed for work, labor, or material (and no rights are outstanding that under any Applicable Law could give rise to any such liens) affecting the Mortgaged Property.

(d)     With respect to any REA affecting the Mortgaged Property, (i) each REA is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (ii) there are no defaults under any REA by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a default under any REA, (iii) all sums due and payable under each REA have been paid in full, (iv) no party to any REA has commenced any action or given or received any notice for the purpose of terminating any REA, and (v) the representations made in any estoppel or similar document delivered with respect to any REA in connection with the Loans, if any, are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

(e)     Borrower has not committed and, to Borrower's knowledge, no other Person in occupancy of or involved with the operation or use of the Mortgaged Property has committed any act or omission affording any Governmental Authority the right of forfeiture as against the Mortgaged Property or any part thereof or any monies paid in performance of Borrower's obligations under the Loan Documents. No portion of the Mortgaged Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity, and, to Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Mortgaged Property.

5.12     Subsidiaries. Except as listed on Schedule 5.12, Borrower has no Subsidiaries. Schedule 5.12 sets forth the entity type of each Subsidiary, if any, and each Subsidiary's jurisdiction of incorporation or organization.

5.13     Encumbrances. There are no security interests in, or liens, mortgages, or other encumbrances on, any of Borrower's property or assets, except Permitted Liens.

5.14     Environmental. Neither Borrower nor any Subsidiary has used Hazardous Materials on, in, under or otherwise affecting any real or personal property now or at any time owned, occupied or operated by Borrower or such Subsidiary or upon which Borrower or such Subsidiary has a place of business (collectively and severally the "Property") in any manner which violates any Environmental Law(s), to the extent that any such violation could result in a Material Adverse Effect; and, to the best of Borrower's knowledge, no prior owner, occupant or operator of any of the Property, or any current or prior owner, occupant or operator thereof, has used any Hazardous Materials on or affecting the Property

in any manner which violates any Environmental Law(s), to the extent that any such violation could result in a Material Adverse Effect. Neither Borrower nor any Subsidiary has ever received any notice of any violation of any Environmental Law(s), and to the best of Borrower's knowledge, there have been no actions commenced or threatened by any party against Borrower or any Subsidiary or any of the Property for non-compliance with any Environmental Law(s), which, in any case, could result in a Material Adverse Effect.

5.15    <u>Material Agreements</u>.  With respect to each Material Agreement, (a) each Material Agreement is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (b) there are no defaults under any Material Agreement by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a default under any Material Agreement, (c) all payments and other sums due and payable under the Material Agreements have been paid in full, (d) no party to any Material Agreement has commenced any action or given or received any notice for the purpose of terminating any Material Agreement, and (e) the representations made in any estoppel or similar document delivered with respect to any Material Agreement in connection with the Loans are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

**ARTICLE 6.**
**COVENANTS OF BORROWER**

Borrower covenants with and warrants to Lender that until all of the Obligations are paid and satisfied in full, Borrower shall comply with, observe, perform or fulfill, and shall cause each Subsidiary to comply with, observe, perform or fulfill, all of the covenants set forth in this <u>Article 6</u>, unless Lender shall have otherwise consented in writing.

6.1    <u>Financial Statements and Reports</u>.

(a)    Borrower and each Subsidiary shall keep complete and accurate books and records, in accordance with GAAP, consistently applied at all times during the pendency of the Loans, and shall permit Lender and its representatives to examine and make copies of the same at any reasonable time.

(b)    Within one hundred twenty (120) days after the end of each fiscal year, Borrower and each Subsidiary shall furnish to Lender its annual CPA reviewed financial statements (on GAAP basis with Notes), including a balance sheet as of the last day of such fiscal year and the related profit and loss and cash flow statements for such year, in a form acceptable to Lender. The foregoing financial statements shall be prepared by independent certified public accountants satisfactory to Lender in accordance with GAAP, consistently applied. Simultaneously with the delivery of the annual financial statements, Borrower shall deliver a covenant compliance certificate setting forth all computations necessary to show compliance by Borrower with the covenants in <u>Section 6.5</u> of this Agreement and stating that except for any Event of Default specifically described therein, no Event of Default has occurred and is continuing.

(c)    Within forty-five (45) days after the end of each calendar quarter, Borrower shall furnish to Lender its management-prepared financial statements, including a balance sheet as of the end of such quarter and a profit and loss statement for such quarter and fiscal year-to-date, certified by an authorized agent of each such entity, in a form acceptable to Lender. Simultaneously with the delivery of such quarterly financial statements, Borrower shall deliver a covenant compliance certificate setting forth all computations necessary to show compliance by Borrower with the covenants in <u>Section 6.5</u> of this Agreement and stating that except as

21

specifically described therein, no Event of Default has occurred and is continuing. The foregoing financial statements shall be prepared in accordance with GAAP.

(d)    Within ten (10) days after the filing thereof, Borrower shall furnish to Lender a copy of its CPA prepared federal income tax returns.

(e)    Within twenty (20) days after the end of each calendar month, Borrower shall furnish to Lender (i) an accounts payable report, (ii) an accounts receivable report, (iii) an Inventory listing, (iv) work-in-process documentation, and (v) a Borrowing Base Certificate.

(f)    Borrower shall furnish to Lender a copy of John F. Tenbusch's CPA prepared annual federal income tax return (including all supporting schedules, including Schedule E, and K-1s) within ten (10) days after the filing thereof.

(g)    Within one year from its prior submission and as of a date not more than sixty (60) days prior thereto, Borrower shall furnish to Lender a personal financial statement of John F. Tenbusch and shall include (without limitation) schedules of contingent liabilities and unsecured indebtedness. Each such statement shall be certified by John F. Tenbusch as to accuracy and completeness, shall be in a form reasonably acceptable to Lender.

(h)    Within forty-five (45) days after the end of each calendar quarter, Borrower shall furnish to Lender a verification of liquidity for John F. Tenbusch.

(i)    Borrower will furnish and cause each of its Subsidiaries and each Guarantor to furnish such other information regarding its (or his) financial matters as Lender may reasonably request promptly after Lender's request therefor.

6.2    _Insurance_.  Borrower shall maintain, and cause each of its Subsidiaries to maintain, insurance coverage pursuant to the Insurance Policies.

6.3    _Borrower's Existence_.  Borrower shall, and cause each of its Subsidiaries to, preserve and continuously maintain its existence and all of its rights, franchises and privileges, including, without limitation, the right to do business in its state of incorporation or organization and each state in which it is required to register due to business operations or the possession or transit of property.

6.4    _Compliance with Applicable Laws_.  Borrower shall, and shall cause each of its Subsidiaries to, comply with all Applicable Laws, and will promptly notify Lender in the event that Borrower or any of its Subsidiaries receives any notice, claim or demand from any Governmental Authority asserting the violation of any Applicable Law which could reasonably be expected to have a Material Adverse Effect upon Borrower or any of its Subsidiaries. Borrower or its Subsidiaries may contest the propriety or the applicability of any Applicable Law, provided (a) that Borrower shall provide Lender with written notice of such contest; (b) that there shall then be no uncured Event of Default; (c) that such contest shall be initiated in good faith in accordance with the appropriate legal or administrative procedure therefor and diligently prosecuted to a timely completion; (d) that such contest shall not, in Lender's judgment, jeopardize the security for the Loans or subject any portion of Borrower's assets to imminent risk of loss or forfeiture; and (e) Borrower shall indemnify Lender from and against any and all liability, loss, cost, damage and expense which may be incurred by or asserted against any Lender or any Affiliate of Lender in connection with or arising from such contest.

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

6.5     Financial Covenants.

        (a)     Borrower shall maintain (or cause to be maintained), as of the last day of each fiscal year, a Debt Service Coverage Ratio of not less than 1.25 to 1.00, measured annually beginning December 31, 2018.

        (b)     John F. Tenbusch shall maintain a minimum collateral value of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in the brokerage account at Charles Schwab Investments, measured quarterly beginning September 30, 2017.

6.6     Notice of Litigation. Borrower shall, and shall cause each of its Subsidiaries to, furnish or cause to be furnished to Lender within five (5) days after Borrower or any of its Subsidiaries shall have first become aware of the same, a written notice identifying, and describing Borrower's or such Subsidiary's proposed response to the commencement or institution of any legal or administrative action, suit, proceeding or investigation by or against Borrower or such Subsidiary in or before any court, governmental or regulatory body, agency, commission or official, board of arbitration or arbitrator which could reasonably be expected to have a Material Adverse Effect on Borrower or any Subsidiary. For the purposes of this Agreement, any such litigation or other matter in which the sum in dispute is Fifty Thousand and 00/100 Dollars ($50,000.00) or more will be deemed to be material.

6.7     Notice of Other Events.

        (a)     If (and on each occasion that) any Event of Default shall occur, Borrower shall, promptly after becoming aware of the same, furnish Lender with a written notice specifying the nature of such Event of Default and describing Borrower's proposed response thereto.

        (b)     Immediately upon Borrower first becoming aware of any of the following occurrences, Borrower will notify Lender in writing of: (i) the business failure, insolvency or bankruptcy of Borrower or any Subsidiary; (ii) the rescission, cancellation or termination of, or the occurrence of a breach, default or event of default under or with respect to any material agreement or contract to which Borrower or any of its Subsidiaries is a party; or (iii) any events of default under any material agreement of Borrower or any of its Subsidiaries or any material violations of any Applicable Law.

6.8     Payment of Taxes and Other Claims. Borrower shall, and shall cause each of its Subsidiaries to, pay and discharge promptly before interest and penalties accrue, all taxes, assessments and other governmental charges or levies at any time imposed upon it or upon its income, revenues or property, as well as all claims of any kind (including claims for labor, material, supplies, or utilities) which, if unpaid, might by law become a lien or charge upon all or any part of its income, revenues or property.

6.9     Payment of Indebtedness. Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loans and all fees and other amounts payable hereunder or under the Loan Documents as and when required by this Agreement and the other Loan Documents.

6.10    Governmental Consents and Approvals. Borrower will obtain, and will cause each of its Subsidiaries to obtain, all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any Governmental Authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any Applicable Law:

23

(a)     for the performance by Borrower or such Subsidiary of any of its agreements or obligations under the Notes, this Agreement or any other Loan Document to which it is a party or for the payment by Borrower to Lender at its Head Office of any sums which shall become due and payable by Borrower thereunder;

(b)     to ensure the continuing legality, validity, binding effect or enforceability of the Notes or any other Loan Document; and

(c)     to continue the proper operation of the business and operations of Borrower.

6.11    Pension and Benefit Plans.  Borrower will, and will cause each of its Subsidiaries to, at all times meet the minimum funding requirements of ERISA with respect to Borrower's and each of its Subsidiaries' employee benefit plans subject to ERISA; promptly after Borrower or any of its Subsidiaries knows or has reason to know of the occurrence of any event which would constitute a reportable event or prohibited transaction under ERISA, or that the PBGC, Borrower or any of its Subsidiaries has instituted or will institute proceedings to terminate an employee pension plan, deliver to Lender a certificate of an authorized officer of Borrower setting forth details as to such event or proceedings and the action which Borrower proposes to take with respect thereto, together with a copy of any notice of such event which may be required to be filed with the PBGC; and upon the request of Lender, furnish to Lender (or cause the plan administrator to furnish Lender) a copy of the annual return (including all schedules and attachments) for each plan covered by ERISA, and filed with the Internal Revenue Service by Borrower or any of its Subsidiaries, as applicable, not later than ten (10) days after such report has been so filed.  Borrower shall be permitted to voluntarily terminate employee pension or benefit plans, so long as any such voluntary termination is done in accordance with ERISA and could not reasonably be expected to have a Material Adverse Effect on Borrower or any of its Subsidiaries.

6.12    Further Assurances; Cooperation.  Borrower will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all further assurances reasonably requested by Lender from time to time in order to give full effect to any of the Loan Documents.  Borrower shall cooperate fully with Lender with respect to any proceedings before any Governmental Authority which may in any way affect Lender's rights under any of the Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

6.13    Awards.  Borrower shall cooperate with Lender in obtaining for Lender the benefits of any insurance proceeds or any compensation paid by any Governmental Authority in connection with a condemnation, in respect of all or any part of the Mortgaged Property, lawfully or equitably payable in connection with the Mortgaged Property ("Award Proceeds").  Borrower shall reimburse Lender for any expenses incurred in connection therewith (including actual attorneys' fees and disbursements and the payment by Lender of the expense of an appraisal on behalf of Borrower in case of a casualty or condemnation affecting the Mortgaged Property) out of such Award Proceeds.

6.14    Use of Proceeds.  Borrower shall use all Loan proceeds only for the uses and purposes permitted by this Agreement and for no other purpose.

6.15    Environmental Matters.

(a)     Borrower shall timely comply, and shall cause each of its Subsidiaries and Affiliates to timely comply, in all material respects with all applicable Environmental Laws.

(b)     Borrower shall provide to Lender, immediately upon receipt, copies of any correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document

24

from any source asserting or alleging a circumstance or condition (i) which requires or may require a financial contribution by Borrower or any of its Subsidiaries or Affiliates or a cleanup, removal, remedial action, or other response by or on the part of Borrower or any of its Subsidiaries or Affiliates under applicable Environmental Laws or (ii) which seeks damages or civil, criminal or punitive penalties from Borrower or any of its Subsidiaries or Affiliates for an alleged violation of Environmental Laws.

(c)     Borrower shall promptly notify Lender in writing as soon as it becomes aware of any condition or circumstance which makes the environmental warranties contained in this Agreement incomplete or inaccurate in any material respect as of any date.

(d)     Borrower hereby indemnifies, saves and holds Lender and each of its past, present and future officers, directors, shareholders, employees, representatives and consultants harmless from any and all loss, damages, suits, penalties, costs, liabilities and expenses (including but not limited to reasonable investigation, environmental audit(s), and legal expenses) arising out of any claim, loss or damage of any property, injuries to or death of persons, contamination of or adverse effects on the environment, or any violation of any applicable Environmental Laws, caused by or in any way related to any property owned, leased or operated by Borrower, or due to any acts of Borrower, or any of its Subsidiaries or Affiliates or any of their officers, directors, shareholders, employees, consultants and/or representatives. In no event shall Borrower be liable hereunder for any loss, damages, suits, penalties, costs, liabilities or expenses (i) arising from any act of gross negligence or willful misconduct of Lender, or its agents or employees or (ii) arising solely from any action taken by Lender while it is in sole possession of any such property.

(e)     Borrower and each of its Subsidiaries and Affiliates have and shall maintain all permits, licenses and approvals required under applicable Environmental Laws.

(f)     Borrower shall promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be reasonably requested by Lender or any governmental authority relative to any Hazardous Material at or affecting any property or any facility owned, leased or used by Borrower or any of its Subsidiaries.

(g)     The provisions of this Section 6.14 shall survive the payment of the Loans and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the assets of Borrower, whether by foreclosure or otherwise.

6.16     Access to Property.     Borrower shall permit Lender's agents, representatives, and employees to inspect any and all property that serves as security for the Loans under any Loan Document, including, without limitation, the Mortgaged Property, at reasonable hours upon reasonable advance notice.

6.17     Alterations.     Borrower may, without Lender's consent, perform alterations to the Mortgaged Property that (a) do not constitute a Material Alteration, (b) could not reasonably be expected to have a Material Adverse Effect on Borrower or otherwise adversely affect the value or net operating income of the Mortgaged Property, and (c) are performed in the ordinary course of Borrower's business. Borrower shall not perform any Material Alteration without Lender's prior written consent.  All alterations to the Mortgaged Property shall be made in a good and workmanlike manner in accordance with all Applicable Laws and shall not create any lien upon or affecting its assets or any portion thereof.

25

6.18 <u>Acquisition of Margin Securities</u>. Borrower shall not own, purchase or acquire (or enter into any contract to purchase or acquire) any "margin security" as defined by any regulation of the Federal Reserve Board as now in effect or as the same may hereafter be in effect.

6.19 <u>Payment of Claims; Encumbrances</u>. Borrower shall, and shall cause each of its Subsidiaries to, (i) keep its assets, whether now owned or hereafter acquired, free of any lien, charge or claim (other than the Permitted Liens); and (ii) not encumber its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any lien, levy, attachment or restraint to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof.

6.20 <u>Borrower's Organizational Documents</u>. Borrower shall not, and shall cause each of its Subsidiaries not to, modify, amend or terminate any of Borrower's or any of its Subsidiaries' Organizational Documents, or permit any of Borrower's or any of its Subsidiaries' Organizational Documents to be modified, amended or terminated, without the prior written consent of Lender. Lender's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Event of Default at the time of Borrower's request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of this Agreement or any other Loan Document.

6.21 <u>Prohibition of Assignments, Transfers and Encumbrances</u>. Borrower shall not, and shall cause each of its Subsidiaries not to, directly or indirectly (i) except in the ordinary course of business, sell, transfer, lease or otherwise dispose of all or any portion of its assets or any interest therein; (ii) except for Permitted Liens, encumber, hypothecate, create a security interest or create or permit any lien upon or affecting its assets or any portion thereof or interest therein; (iii) assign, transfer or encumber any interest of Borrower or any of its Subsidiaries under this Agreement or under any other Loan Document, or delegate any of Borrower's or any of its Subsidiaries' duties or obligations hereunder or thereunder; (iv) purchase, acquire, issue or redeem any of its Capital Securities or make any material change in its capital structure; (v) change its name, consolidate with or merge into any other Person or permit any other Person to merge into it; or (vi) enter into any sale-leaseback transaction.

6.22 <u>Prohibition of Other Indebtedness</u>. Borrower shall not, and shall cause each of its Subsidiaries not to, directly or indirectly, become or remain obligated for any indebtedness for borrowed money, or for any indebtedness incurred in connection with the acquisition of any property, real or personal, tangible or intangible, except: (i) indebtedness to Lender, (ii) current unsecured trade payables and accrued liabilities arising in the ordinary course of Borrower's or any of its Subsidiaries' business, (iii) purchase money indebtedness for the acquisition of fixed assets not exceeding Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00).

6.23 <u>Loans, Acquisitions, Guaranties, Affiliate Transactions</u>. Borrower shall not, and shall cause each of its Subsidiaries not to, directly or indirectly, (i) make any loan, investment, advance or extension of credit to any Person, (ii) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any Capital Securities of any other Person, (iii) incur any obligation as surety or guarantor, other than in the ordinary course of business, (iv) enter into any transaction with an Affiliate that in not on terms and conditions as favorable to Borrower as would be obtainable in a transaction with a Person that is not an Affiliate or (v) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

6.24     Dividends; Distributions.  If an Event of Default shall have occurred and be continuing, Borrower shall not, and shall cause each of its Subsidiaries not to, pay any Dividends on its Capital Securities.

6.25     Expenses; Taxes; Indemnity.

(a)     Borrower agrees to pay or cause to be paid, and to save Lender harmless against liability for the payment of, all reasonable out-of-pocket costs and expenses (including but not limited to reasonable fees and expenses of counsel) (i) incurred by Lender arising from or relating to the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents, unless waived by Lender (ii) incurred by Lender arising from or relative to the administration or performance of this Agreement and the other Loan Documents or any requested amendments, modifications, supplements, waivers or consents (without regard to whether any of the same is ultimately entered into or granted) to this Agreement or any Loan Document, and (iii) incurred by Lender in connection with the enforcement or preservation of rights under this Agreement or any other Loan Document.

(b)     Borrower hereby agrees to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of Lender) now or hereafter determined by Lender to be payable in connection with this Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and Borrower agrees to save Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions.

(c)     Borrower hereby agrees to reimburse and indemnify Lender and each of Lender's past, present and future officers, directors, shareholders, employees, representatives and consultants (collectively, the "Indemnified Parties") from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the fees and disbursements of counsel for such Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto) that may at any time be imposed on, asserted against or incurred by such Indemnified Party as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document or any transaction from time to time contemplated hereby or thereby, but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final and non-appealable judgment.

6.26     Pension or Profit Sharing Plans.  Borrower shall not, and shall cause each of its Subsidiaries not to, allow any fact, condition or event to occur or exist with respect to any employee pension or profit sharing plan established or maintained by Borrower or any of its Subsidiaries which might constitute grounds for termination of any such plan or for the court appointment of a trustee to administer any such plan; or permit any such plan to be the subject of termination proceedings (whether voluntary or involuntary) which may result in a liability of Borrower or any of its Subsidiaries to the PBGC which, in the opinion of Lender, could have a Material Adverse Effect.

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

6.27   Bank Accounts.  Borrower shall maintain, and shall cause each of its Subsidiaries to maintain, all primary deposit accounts at Lender which accounts shall be fully funded within ninety (90) days after the Closing Date.

6.28   Field Audits.  Borrower agrees that Lender may conduct audits of Borrower, its Subsidiaries and their operations, the results of which shall be reasonably satisfactory to Lender, and the costs of which shall be paid by Borrower.

6.29   Landlord Waivers; Collateral Access Agreements; Bailee Letters.  Upon request by Lender, Borrower shall deliver to Lender the following, each of which shall be in form and substance acceptable to Lender: (a) executed landlord waivers or other collateral access agreements with respect to all locations leased by Borrower; and (b) executed bailee letters with respect to all locations at which Borrower stores any Inventory or other assets.  Thereafter, upon request by Lender, Borrower shall deliver to Landlord any agreements for any additional leased locations or storage or warehouse locations to which Borrower is a party, which agreements must be in writing.

## ARTICLE 7.
## DEFAULTS AND REMEDIES

7.1   Events of Default.  Any of the following events shall constitute an "Event of Default" under this Agreement:

(a)   Borrower shall fail to pay to Lender or otherwise perform any of the Obligations owing by Borrower to Lender, when due, and such default in payment shall continue unremedied or uncured beyond any applicable period of grace provided with respect thereto, if any, in the relevant Loan Document(s);

(b)   any representation, warranty, certification or statement made or deemed to have been made by Borrower herein, or by any Person(s) (including, without limit, Borrower) in any certificate, financial statement or other document or agreement delivered by or on behalf of Borrower in connection with the Obligations or any of the Loan Documents, shall prove to be untrue or misleading in any material respect;

(c)   Borrower or any of its Subsidiaries shall fail to observe or perform any condition, covenant or agreement of Borrower or such Subsidiary set forth herein;

(d)   Borrower or any of its Subsidiaries shall fail to observe or perform any condition, covenant or agreement of Borrower set forth in any other Loan Document to which Borrower or such Subsidiary is a party (other than as provided in subparagraphs (a) and (c) above), and such default shall remain unremedied or uncured beyond any applicable period of grace or cure, if any, provided with respect thereto;

(e)   default in the observance or performance of any of the conditions, covenants or agreements of Borrower or any other Person set forth in any Loan Document;

(f)   default in the payment of any obligation of any of Borrower's Subsidiaries to Lender; or default in the payment of any other obligation of Borrower or any of its Subsidiaries for borrowed money, other than to Lender, or in the observance or performance of any conditions, covenants or agreements related or given with respect to any such obligation sufficient to permit the holder thereof to accelerate the maturity of such obligation, including under any other mortgage, deed of trust, deed to

W:\DATA\CLDOCS\0628\0191\01625482.DOCX

secure debt, or other security agreement covering any part of the Mortgaged Property, whether it be superior or junior in lien to the Mortgage;

(g)     any judgment for the payment of money shall be rendered against Borrower or any of its Subsidiaries and such judgment shall remain unpaid, unvacated, unbonded or unstayed by appeal or otherwise for a period of thirty (30) consecutive days from the date of its entry and such judgment is not covered by insurance from a solvent insurer who is defending such action without reservation of rights;

(h)     any change in the ownership, control or management of Borrower which Lender has determined will likely have a Material Adverse Effect on the business, operations or condition (financial or otherwise) of Borrower or any Subsidiary;

(i)     intentionally omitted;

(j)     the occurrence of any "reportable event", as defined in ERISA, which (i) is determined to constitute grounds for (A) termination by the PBGC of any pension plan of Borrower or any of its Subsidiaries or (B) the appointment by the appropriate United States District Court of a trustee to administer such plan, (ii) is reasonably likely to result in a Material Adverse Effect, and (iii) is not corrected and such determination is not revoked within thirty (30) days after (A) notice thereof has been given to the plan administrator, Borrower or such Subsidiary; (B) the institution of proceedings by the PBGC to terminate any such pension plan or to appoint a trustee to administer such plan; or (C) the appointment of a trustee by the appropriate United States District Court to administer any such pension plan;

(k)     (i) if a creditors' committee shall have been appointed for the business of Borrower or any of its Subsidiaries; (ii) if Borrower or any of its Subsidiaries (A) shall have made a general assignment for the benefit of creditors, (B) shall have been adjudicated bankrupt, (C) shall have filed a voluntary petition in bankruptcy or for reorganization or to effect a plan or arrangement with creditors, (D) shall have filed an answer to a creditor's petition or other petition filed against it, admitting the material allegations thereof for an adjudication in bankruptcy or for reorganization, or (E) shall have applied for or permitted the appointment of a receiver, trustee or custodian for any of its property or assets or such receiver, trustee or custodian shall have been appointed for any of its property or assets (otherwise than upon application or consent of Borrower or any of its Subsidiaries, as applicable); or (iii) if an order shall be entered approving any petition for reorganization of Borrower or any of its Subsidiaries;

(l)     if (i) Borrower shall fail (beyond any applicable notice or grace period) to pay any charges payable under any REA or Material Agreements as and when payable thereunder, (ii) Borrower defaults under any REA or Material Agreements beyond the expiration of applicable notice and grace periods, if any, thereunder, (iii) any REA or Material Agreements are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent or if Borrower consents to a transfer of any party's interest thereunder without Lender's prior written consent, or (iv) any REA or Material Agreements and/or the estate created thereunder is canceled, rejected, terminated, surrendered or expires pursuant to its terms, unless in such case Borrower enters into a replacement thereof in accordance with the applicable terms and provisions hereof;

(m)     whenever Lender deems that the security provided by Borrower to Lender pursuant to this Agreement or any other Loan Document is insufficient to secure the Obligations;

(n)     whenever Lender in good faith deems itself insecure; or

(o)    upon the occurrence or existence of any "Default" or "Event of Default", as the case may be, set forth in any other Loan Document.

Notwithstanding anything herein to the contrary, upon the occurrence of any non-monetary Event of Default as provided in this Section 7.1, Borrower shall be provided thirty (30) days to cure such an Event of Default to Lender's satisfaction upon written notice from Lender, which shall be provided as set forth in Section 9.2 herein.

7.2    Certain Remedies.

(a)    If any Event of Default shall occur and be continuing:

(i)    Lender may, by giving notice to Borrower, declare all of the Obligations, including the entire unpaid principal balance of the indebtedness evidenced by the Notes, all interest accrued thereon, and any and all other sums payable by Borrower under this Agreement, the Notes or any other Loan Document, to be immediately due and payable. Thereupon, all of such Obligations which are not already due and payable shall forthwith become absolutely and unconditionally due and payable, without presentment, demand, protest or any further notice or any other formalities of any kind, all of which are hereby expressly and irrevocably waived. Any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate; and

(ii)    Lender may proceed to protect and enforce all or any of its rights, remedies, powers and privileges under this Agreement, the Notes or any other Loan Document by action at law, suit in equity or other appropriate proceedings, whether for specific performance of any covenant contained.

(b)    Upon the occurrence and at any time during the continuance or existence of an Event of Default under Section 7.1(k) of this Agreement, then the Obligations and all indebtedness then outstanding thereunder shall automatically become immediately due and payable without any notice by Lender to Borrower and any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Further, upon the occurrence or at any time during the continuance or existence of any default hereunder, Lender may collect, deal with and dispose of all or any part of any security in any manner permitted or authorized by the Michigan Uniform Commercial Code or other Applicable Law (including public or private sale), and after deducting expenses (including, without limitation, reasonable attorneys' fees and expenses), Lender may apply the proceeds thereof in part or full payment of any of the Obligations, whether due or not, in any manner or order Lender elects. In addition to the foregoing, upon the occurrence and at any time during the continuance or existence of any default hereunder, Lender may exercise any and all rights available to it under the Loan Documents or by application of law.

7.3    No Implied Waiver; Rights Cumulative. No delay by Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document, or available to it at law or in equity, shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege or be construed as a waiver of (or acquiescence to) any Event of Default. No right, remedy, power or privilege conferred on or reserved to Lender under any of the Loan Documents, in equity or at law is intended to be exclusive of any other right, remedy, power or privilege which may then be, or may thereafter become, available to Lender. All rights, remedies, powers and privileges available to Lender shall be cumulative;

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

any of the same may be exercised at such time or times and in such order and manner as Lender shall (in its sole discretion) deem expedient.

7.4    Intentionally Omitted.

7.5    Right of Setoff. Borrower grants Lender the right, exercisable at any time, whether or not Borrower is then in Default, to set off or apply against the Obligations any account or deposit with Lender in which Borrower has an interest or against any other amounts which may be in the possession of Lender and to the credit of Borrower.

## ARTICLE 8.
## PARTICIPATION INTERESTS

8.1    Right to Sell Participation Interest. Lender shall have the right to sell one or more participation interests in the Loans. If requested by Lender, Borrower shall assist Lender, at Borrower's cost and expense, in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace in connection with any Participation, including, without limitation:

(a)    (i) providing updated financial and other information with respect to the Mortgaged Property and the business operated at the Mortgaged Property (ii) providing updated budgets for the Mortgaged Property, and (iii) providing updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Mortgaged Property, together, if customary, with appropriate verification of such information through letters of auditors or opinions of counsel acceptable to Lender; and

(b)    providing updated representations and warranties, as of the closing date of any Participation, based upon those made in the Loan Documents and such additional representations and warranties as the Lender may reasonably require.

8.2    Dissemination of Information. Lender may disseminate to any lender party that has purchased a Participation or who has expressed interest in purchasing a Participation (and to any investment banking firms, accounting firms, law firms and other third party advisory firms and investors involved with the Loans and the Loan Documents or the applicable Participation) all documents and financial and other information then possessed by or known to Lender with respect to: (i) the Mortgaged Property and its operation, and (ii) any party connected with the Loans (including, without limitation, any Subsidiary).

## ARTICLE 9.
## MISCELLANEOUS PROVISIONS

9.1    Consent or Approval.

(a)    In all instances in which Lender's approval of or consent to any item, matter or circumstance is contemplated by the terms of this Agreement or any other Loan Document, such approval or consent or the exercise of such judgment shall (unless otherwise specified) (i) be within the absolute discretion of Lender, and (ii) be expressed only by a specific writing intended for such purpose and signed by Lender.

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

(b)     Lender shall not, by reason of its consent or approval of any item or matter submitted to it, be deemed to have assumed or undertaken any responsibility or obligation for the adequacy, accuracy, completeness, efficacy, form or content of any such matter or item.

9.2     Duration.  This Agreement shall continue in full force and effect and the duties, covenants, and liabilities of Borrower hereunder and all the terms, conditions, and provisions hereof relating thereto shall continue to be fully operative until all Obligations have been satisfied in full, provided, however that notwithstanding the provisions of this Section, all Loans shall be due and payable as set forth in the Notes.

9.3     Survival.

(a)     All representations and warranties made by or on behalf of Borrower in this Agreement or any other Loan Document shall be deemed to have been relied upon by Lender notwithstanding any investigation which may be made by Lender.  All such representations and warranties shall survive the closing of the transactions described herein and the disbursement of the proceeds of the Loans until all of the Obligations shall have been fully, finally and indefeasibly paid in full.

(b)     Borrower's obligations and liabilities under Sections 3.2, 6.15(d), and 6.25(c) shall fully survive indefinitely, notwithstanding (i) any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure relating to the Mortgage, or (ii) the full, final, and indefeasible payment in full of the Obligations.

9.4     Offsets, Counterclaims and Defenses.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents.  Borrower hereby expressly waives any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding.

9.5     Binding Effect.  This Agreement shall inure to the benefit of and be binding upon Borrower, Lender, and their respective successors and assigns; provided, however, that this Agreement may not be assigned by Borrower without the prior written consent of Lender.

9.6     Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall constitute a single agreement.

9.7     Notices.  Except for any notice required by any Applicable Law to be given in another manner, any notice, demand, request or other communication to be given by either party to the other shall be in writing and shall be deemed to have been properly given (a) if hand delivered or if sent by telecopy, effective upon receipt; (b) if delivered by overnight courier service, effective on the day following delivery to such courier service; or (c) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) days after deposit in the United States mails, addressed in each case to the parties at their addresses set forth herein, or at such other address or to such other addressee as a party may have so furnished to the other:

W:\DATA\CL\DOCS\06288\0191\01625482.DOCX

(a)    If to Borrower:

        Linear Mold & Engineering, LLC
        12926 Stark Road
        Livonia, Michigan 48150
        Attention: John F. Tenbusch
        Facsimile No.: _____

(b)    If to Lender:

        Level One Bank
        32991 Hamilton Court
        Farmington Hills, Michigan 48334
        Attention: Charles E. Borders
        Facsimile No.: (248) 419-3010

With a copy to:

        Dawda Mann, PLC
        Dawda Mann Building
        Suite 200
        39533 Woodward Avenue
        Bloomfield Hills, Michigan 48304
        Attention: Wayne S. Segal
        Facsimile No.: (248) 642-7791

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower, and (b) with respect to matters for which Lender is required by Applicable Law to give notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

9.8    Waiver of Jury Trial. AFTER HAVING THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, AND FOR THEIR MUTUAL BENEFIT, BORROWER AND LENDER, BY ACCEPTANCE OF THIS AGREEMENT, HEREBY EXPRESSLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT. TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOANS, THE APPLICATION FOR THE LOANS, THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

9.9    Entire Agreement. This Agreement, together with all of the other Loan Documents, constitutes the entire agreement between Borrower and Lender with respect to the making and funding of the Loans, and no representations or agreements, express or implied, have been made to or with Borrower not herein or therein contained.

9.10    Modification. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or any other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing duly executed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

the specific instance and for the purpose given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

9.11 <u>Jurisdiction; Governing Law</u>. This Agreement shall be governed by the laws of the State of Michigan. Borrower hereby waives any plea of jurisdiction or venue on the ground that Borrower is not a resident of Oakland County, Michigan, and hereby specifically authorizes any action brought to enforce Borrower's obligations to Lender to be instituted and prosecuted in either the Circuit Court of Oakland County, Michigan, or in the United States District Court for the Eastern District of Michigan at the election of Lender, and Borrower hereby submits to the jurisdiction of such Court. Borrower further agrees and consents that, in addition to any methods of service of process provided for under any Applicable Law, all service of process in any proceeding in any Michigan State or United States Court sitting in Oakland County, Michigan may be made by certified or registered mail, return receipt requested, directed to Borrower, as applicable, at the address indicated herein, and service so made shall be complete upon receipt; except that if Borrower shall refuse to accept delivery, service shall be deemed complete five (5) days after the same shall have been so mailed.

9.12 <u>Headings</u>. Paragraph headings used in this Agreement are intended for convenience of reference only, and shall not be deemed to alter, affect or limit the meaning of any provision of this Agreement.

9.13 <u>Severability</u>. If any provision of this Agreement, or the application of any provision to any person or circumstance, shall be invalid or unenforceable to any extent, the balance of this Agreement and the application of all provisions of this Agreement to all other persons and circumstances shall not be affected thereby; each provision of this Agreement shall remain valid and enforceable to the fullest extent permitted by law.

9.14 <u>Relationship</u>. The relationship between Borrower and Lender is strictly contractual in nature, and is governed entirely by this Agreement and the other Loan Documents. Nothing contained in this Agreement, and no action which Lender may take hereunder or in respect of the Loan, will create any agent, partnership, co-venture or joint venture between Borrower and Lender or will make Lender liable in any manner to any party dealing with Borrower.

9.15 <u>Patriot Act</u>. Borrower and each of its Subsidiaries is not (or will not be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the Department of the Treasury of the United States of America (including, those Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide to Lender with any additional information that Lender deems necessary from time to time in order to ensure compliance with all applicable Laws concerning money laundering and similar activities.

9.16 <u>USA Patriot Act Notice of Customer Identification</u>. To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Therefore, when you open an account, we will ask your name, address, date of birth, taxpayer identification number, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

9.17   <u>Joint Liability</u>. If Borrower consists of more than one Person, the obligations and liabilities of each such Person under this Agreement shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

9.18   <u>Conflict</u>. In the event of any conflict between the provisions of this Agreement and the other Loan Documents, the provisions of this Agreement shall control.

9.19   <u>Copies as Originals</u>. Borrower acknowledges and agrees that (a) copies of this Agreement, the Notes and the other Loan Documents, including without limitation photocopies, facsimiles and electronically scanned copies, shall be deemed originals and shall be enforceable without the necessity of producing originals, (b) Borrower shall not contest the existence, validity or enforceability of this Agreement, the Notes or any of the other Loan Documents on account of the failure of Lender to produce an original of this Agreement, the Notes or the other Loan Documents, and (c) Lender may, without notice to or the consent of Borrower, dispose of or destroy the originals of this Agreement, the Notes and the other Loan Documents without affecting Lender's rights under this Agreement, the Notes and the other Loan Documents.

[Signatures appear on next page]

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

The parties have caused this Loan Agreement to be executed and delivered of the day and year first set forth above.

BORROWER:

**LINEAR MOLD & ENGINEERING, LLC,**
a Michigan limited liability company

By: _____
John F. Tenbusch, Manager

LENDER:

**LEVEL ONE BANK,**
a Michigan banking corporation

By: _____
Charles E. Borders, Vice President

[Signature Page to Loan Agreement]

W:\DATA\CLDOCS\06288\0191\01625482.DOCX

**SCHEDULE 5.10**

**Locations**

1.    12926 Stark Road, Livonia, Michigan 48150

## SCHEDULE 5.12

### Subsidiaries

NONE

**EXHIBIT 2**

## LOAN AFFIRMATION AND RESTRUCTURE AGREEMENT

This Loan Affirmation and Restructure Agreement (this **"Agreement"**) is entered into as of December 3], 2019 (**"Execution Date"**), but effective as of October 11, 2019 (the **"Effective Date"**), by and among LEVEL ONE BANK, a Michigan banking corporation (**"Bank"**), LINEAR MOLD & ENGINEERING, LLC, a Michigan limited liability company (**"Linear Mold"**), LINEAR REALTY, LLC, a Michigan limited liability company (**"Linear Realty"** and together with Linear Mold, each a **"Borrower"** or together, **"Borrowers"**), JOHN F. TENBUSCH, individually (**"Mr. Tenbusch"**), THE JOHN F. TENBUSCH REVOCABLE LIVING TRUST DATED JULY 29, 2014, AS MAY BE AMENDED (the **"Tenbusch Trust"**), and LOUIS J. YOUNG, JR. (**"Mr. Young"**, and collectively with Mr. Tenbusch and the Tenbusch Trust, each a **"Guarantor"** or collectively, **"Guarantors"**). Borrowers and Guarantors are each referred to separately as a **"Borrower Party"** and collectively as the **"Borrower Parties."**

### *Recitals and Definitions*

A.    Bank is the lender, and Borrowers are the borrowers, as the case may be, under three (3) loans (**"Loans"**), as follows:

    1.    *Promissory Note (Line of Credit - Prime)* dated July 17, 2017, executed by Linear Mold, for the original principal amount of $2,500,000, later revised to $2,000,000, as amended and/or extended (**"Note 40015225"**).

    2.    *Promissory Note (Term Loan)* dated August 2, 2018, executed by Linear Realty, for the principal amount of $1,650,000, as amended and/or extended (**"Note 40017895"**).

    3.    *Amended and Restated Promissory Note (Non-Revolving Line of Credit)* dated August 24, 2018, executed by Linear Realty for the principal amount of $1,320,000, as amended and/or extended (**"Note 40018000"** and together with Note 40015225 and Note 40017895, each a **"Note"** and collectively, the **"Notes"**).[1]

B.    Guarantors have guaranteed the payment of the Loans pursuant to respective *Continuing Guaranty* agreements dated on or about July 17, 2017, as may have been amended.

C.    The term **"Loan Documents"** as used hereafter means the Notes, Mortgage, Security Agreements, Pledge Agreement, Guaranties, Amendments, and all other agreements and undertakings made by Borrower(s) or any third-party to Bank in connection with this Agreement and all other documents and instruments previously, now or in the future furnished to Bank to evidence or secure payment or performance of any of the Obligations (as hereafter defined), all as may have been, or may be, amended, ratified, renewed, substituted, superseded or otherwise modified from time to time.

D.    The term **"Obligations"** as used herein means all obligations together with all expenses and fees called for by the Loan Documents.

E.    Borrower Parties have defaulted under the Loan Documents.

F.    On or about October 11, 2019, Bank demanded and accelerated all Obligations from the Borrower Parties. Borrower Parties have not paid all Obligations as required under the Loan Documents and are in default of the Loans.

G.    Borrower Parties have requested that Bank forbear from taking action with regard to default of the Loans and Bank has agreed to such forbearance, subject to the terms and conditions of this Agreement.

---

[1] *Note 40018000 is an amendment and restatement of a certain Promissory Note (Line of Credit) dated August 2, 2018, executed by Linear Realty, for the principal amount of $1,320,000.*

*Agreements:*

1.    Acknowledgment of Default. Borrower Parties acknowledge and agree that the Loans are in default as a result of (a) failure to timely pay the 2019 summer real property taxes for 12163 Globe, Street, Livonia, Michigan 48150 (a mortgaged property), (b) the Loan based on Note 40015225 being out of formula by $1,004,341.00 as of August 31, 2019, (c) Linear Mold's failure to comply with the debt service coverage ratio covenant as of December 31, 2018, and (d) Borrower Parties' failure to pay the Notes as required by the Loan Documents (collectively, the "**Declared Default**"). Borrower Parties further acknowledge that Bank has the right to exercise any and all rights and remedies available upon such default pursuant to the Loan Documents, at law, or in equity.

2.    Forbearance Period. Bank agrees to forbear from taking action with regard to the default of the Loans until April 1, 2020 (the "**Forbearance Period**"), subject to compliance by Borrower Parties with the terms, conditions, representations and warranties and other agreements set forth in this Agreement.

3.    Acknowledgment of Debt. Borrower Parties acknowledge that as of November 29, 2019, the current unpaid balance of the Notes (exclusive of costs and expenses) is as follows:

| Note | Principal | Interest | Late Charges | Subtotals |
|---|---|---|---|---|
| 40015225 | $ 1,266,795.65 | $ 16,546.14 | $ 221.12 | $ 1,283,562.91 |
| 40017895 | $ 1,389,837.49 | $ 11,421.81 | $ 150.00 | $ 1,598,614.70 |
| 40018000 | $ 1,319,990.83 | $ 12,228.24 | $ 1,362.37 | $ 1,333,581.44 |
| *Grand Total* | | | | $ 4,215,759.05 |

The amounts referenced above are exclusive of costs and expenses (including, but not limited to, attorney's fees), SWAP fees, and interest accruing after November 29, 2019, for which Borrower Parties remain responsible. The SWAP "break fee" was $197,205.40 as of November 29, 2019.

4.    Ratification of Loan Documents. Borrower Parties acknowledge and agree that:

  a.    The Loan Documents and the mortgage(s) and other liens granted to Bank by Borrower against the collateral pledged as security for the Loans (the "**Collateral**") remain first and valid security interests in and liens against the Collateral.

  b.    There are no claims, setoffs or defenses to Bank's exercise of any rights or remedies available to Bank under the terms of the Loan Documents.

  c.    The Loan Documents are valid, binding and enforceable documents and agreements.

  d.    All of the agreements, terms, covenants, representations, warranties and conditions of the Loan Documents, as herein amended, are ratified and confirmed in their entirety.

5.    Ratification of Guaranties. Guarantors acknowledge and agree to the continuing authenticity and enforceability of each Continuing Guaranty and ratify and confirm each such Continuing Guaranty, as may have been amended, in their entirety. Each Guarantor agrees that each Continuing Guaranty shall remain in effect until the Obligations to Bank have been fully paid in accordance with the terms of this Agreement.

6.    Payments; Performance; Forbearance Fee. Borrower Parties acknowledge and agree that:

  a.    During the Forbearance Period, Borrower shall (a) make monthly payments of principal and interest as provided in the Loan Documents, and (b) otherwise comply with all of the terms of the Loan Documents, as herein modified.

  b.    Upon expiration of the Forbearance Period, the Obligations shall be paid in full.

R:\Customers\K-L\Linear Molding-Realty\Forbearance Agreement - v1 (02271518-5xAB04A).doc

c.        Borrower Parties shall pay Bank a forbearance fee of One Thousand Five Hundred and 00/100 Dollars ($1,500.00), which shall be payable upon execution of this Agreement.

d.        Borrower Parties shall reimburse Bank for any and all fees, costs and expenses including, without limitation, attorneys' fees, and costs of credit reports, surveys, appraisals, title work and mortgagee's title insurance, whether now or hereafter incurred or paid by Bank in connection with the Loans, all of which shall be paid upon the earlier of (i) the expiration of the Forbearance Period, or (ii) payment in full of the Loans.

7.        <u>Reporting Requirements</u>. Borrower Parties shall furnish Bank (or cause to be furnished to Bank) the items specified below, in form and detail satisfactory to Bank:

a.        Company-prepared financial statements for Linear Mold, to be provided by the 15th day of the following calendar month (*by way of illustration, December, 2019, financial statements are due by January 15, 2020, etc.*).

b.        13-week cash flow for Linear Mold, to be provided by the 15th day of the following calendar month (*by way of illustration, December, 2019, 13-week cash flow is due by January 15, 2020, etc.*).

c.        Any other information requested by Bank within seven (7) days of any such request.

8.        <u>Representations</u>. Borrower Parties represent and warrant to Bank that:

a.        Other than the Declared Default, no other defaults exist under the Loan Documents and no circumstances exist that with the passage of time, the giving of notice, or both, could constitute a default under the Loan Documents.

b.        All company resolutions, trust certificates, and other authority documents heretofore delivered to Bank relative to borrowing money, pledging collateral, and guaranteeing indebtedness remain in full force and effect.

c.        All financial information of Borrower Parties delivered to Bank heretofore or hereafter is correct and complete in all material respects and accurately represents the financial condition of Borrower Parties.

d.        Borrower Parties have duly authorized and validly executed and delivered this Agreement.

e.        No proceedings in bankruptcy or receivership have been instituted by or against any Borrower Party, nor has any Borrower Party made any assignment for the benefit of creditors.

f.        There are no judgments against any Borrower Party or any garnishment, attachment or other levy against any Borrower Party or its property.

g.        There are no actions, suits, or proceedings pending or, to the knowledge of any Borrower Party, threatened against or affecting any Borrower Party or any property of any Borrower Party, in any court or before any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

h.        There is no state or Federal tax lien or any other state or Federal lien of any kind or nature that could constitute a lien or charge against the Collateral.

i.        There are no liens, options to purchase, purchase agreements or other agreements that encumber the Collateral, except in favor of Bank.

3

The foregoing representations and warranties shall be true and correct as of the Effective Date and at all times during the Forbearance Period.

9.     **Forbearance.** Unless an Event of Default occurs, Bank shall forbear from exercising its right to immediately foreclose its lien upon and security interests in the Collateral and otherwise enforce its rights under the Loan Documents. Borrower Parties acknowledge and agree that this Agreement is merely a temporary delay on the part of Bank in exercising its rights and remedies under the Loan Documents only during the Forbearance Period and only if there is no Event of Default.

10.     **Event of Default.** For purposes of this Agreement **"Event of Default"** means any one (1) of the following events:

    a.     The occurrence of a default (other than the Declared Default) under, or failure to comply with any of the terms, conditions or provisions of, the Loan Documents (other than this Agreement).

    b.     Failure to comply with any of the terms, conditions or provisions of this Agreement.

    c.     A beach of any warranty, representation or covenant set forth in this Agreement.

    d.     Proceedings under the Bankruptcy Code or other bankruptcy, reorganization, readjustment of debt, insolvency, dissolution, liquidation, or other similar law of any jurisdiction or otherwise are instituted by or against any Borrower Party; or (ii) Proceedings for the appointment of a receiver, trustee or liquidator of any Borrower Party, are instituted by or against any Borrower Party.

    e.     Any attachment, garnishment, execution, levy or similar process shall at any time be placed upon any assets of any Borrower Party.

    f.     Any judgment is entered against any Borrower Party.

    g.     Any statement, representation or information made or furnished by or on behalf of any Borrower Party to Bank in connection with or to induce Bank to enter into this Agreement shall prove to be false in material respects or materially misleading when made or furnished.

    h.     The death, dissolution, merger, consolidation, termination of existence, insolvency, or assignment for the benefit of creditors of any Borrower Party.

    i.     There is a substantial change in the existing or prospective financial condition of any Borrower Party which Bank in good faith determines to be materially adverse.

11.     **Effect of Event of Default; Remedies.** Upon the occurrence of any Event of Default, Bank reserves its rights to prosecute its claims, including the right to enforce payment of the entire amount of the Obligations. Further, Bank's obligation to forbear from the exercise of its rights and remedies shall immediately terminate without further notice or opportunity to cure. In particular, Bank may immediately exercise singularly, consecutively and cumulatively, at such times, with such frequency and in such order as Bank may elect, all of Bank's rights and remedies under this Agreement, the Loan Documents and at law or equity.

12.     **Agreement Controls.** Anything contained in any Loan Document to the contrary notwithstanding, if there is any express conflict between the terms and provisions of such other Loan Document and those contained in this Agreement, the terms and provisions of this Agreement shall govern and control.

13.     **Release of Claims against Bank.** In consideration of Bank's forbearance from exercising its rights and remedies, Borrower Parties waive, release and affirmatively agree not to allege or otherwise pursue any and all defenses, affirmative defenses, counterclaims, claims, causes of action, setoffs or other rights that they may have, or claim to have for any and all claims, harm, injury and damage of any and every kind, known

4

or unknown, legal or equitable, which Borrower Parties have, or may claim to have, against Bank, its directors, officers, employees, attorneys and agents from the date of the Borrower Parties' first contact with Bank up to the date of this Agreement.

14. **Waiver of Trial by Jury.** BANK AND BORROWER PARTIES ACKNOWLEDGE AND AGREE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT, THE LOAN DOCUMENTS OR THE OBLIGATIONS.

15. **Notice.** All notices, demands and requests required or permitted to be given to Borrower Parties or Bank hereunder or by law shall be in writing and shall be deemed delivered upon actual delivery or first refusal to accept delivery. Delivery may be made as follows: (a) personal delivery, (b) via nationally recognized overnight delivery carrier, or (c) United States first class mail, to the respective addresses set forth below or such other address as shall be designated in writing by such party:

> If to Linear Mold or Linear Realty:
>
> Linear Mold & Engineering, LLC
> Linear Realty, LLC
> Attn: John F. Tenbusch and Louis J. Young, Jr.
> 12163 Globe Street
> Livonia, Michigan 48150
>
> If to Mr. Tenbusch or the Tenbusch Trust:
>
> John F. Tenbusch and Trust
> ~~50842 Calvert Isle Drive~~
> ~~Novi, Michigan 48374~~     49098 Veneto Dr. Northville, MI 48167
>
> If to Mr. Young:
>
> Louis J. Young, Jr.
> 34678 Pembroke Avenue
> Livonia, Michigan 48152
>
> If to Bank:
>
> Level One Bank
> 32991 Hamilton Court
> Farmington Hills, Michigan 48334
> Attention: Jacob D. Hachey

16. **Advice of Counsel.** Each party hereto acknowledges that it has had the advice of legal, accounting and other professional advisers or the opportunity to obtain such advice. Each party hereto has read and understands this Agreement and is executing this Agreement as the party's free act and without duress with the intent to be legally bound.

17. **Governing Law.** This Agreement shall be governed by the laws of the State of Michigan. Paragraph headings are for reference only and have no substantive meaning.

18. **Entire Agreement.** This Agreement and the Loan Documents is the entire understanding and the final agreement between the parties relating to the subject matter of this Agreement and supersedes all prior

R:\Customers\K-L\Linear Molding-Realty\Forbearance Agreement - v1 (02271518-5xAB04A).doc

agreements, negotiations or understandings between the parties relating to the subject matter of this Agreement.

19.   Time of Essence.  Time is of the essence with regard to each provision of this Agreement.

20.   Waivers and Forbearance.  Other than as expressly set forth in this Agreement, and notwithstanding Bank's willingness to forbear thus far, neither this Agreement nor any other written or verbal communication or action, nor any acceptance of any payments in an amount less than the amount due, by Bank is, nor should be construed as, a waiver of any defaults, claims, rights or remedies, or as a promise, agreement of representation of any kind, expressed or implied, on the part of Bank to make any other financial accommodation, or to continue to forbear, postpone or refrain from taking any action with respect to the Loan.

21.   Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which all together constitute one and the same original.  One or more counterparts may be delivered by facsimile, with the intention that they shall have the same effect as an original counterpart thereof.

*[Balance of this page intentionally left blank; signatures appear on following page]*

6

The parties have executed this Loan Affirmation and Restructure Agreement as of the date set opposite their respective signatures, the last of which shall be the Execution Date inserted into the opening paragraph of this Agreement, but effective for all purposes as of the Effective Date.

**Bank**:

LEVEL ONE BANK,
a Michigan banking corporation

By: _Jacob D. Hachey_                              December 31, 2019
Jacob D. Hachey
Its:     Vice-President, Managed Assets

**Linear Mold**:

LINEAR MOLD & ENGINEERING, LLC,
a Michigan limited liability company

By: _JOHN TENBUSCH_                              December 24, 2019
Its: _CEO_

LINEAR REALTY, LLC,
a Michigan limited liability company

By: _JOHN TENBUSCH_                              December 24, 2019
Its:

**Guarantors**:

_____                              December 24, 2019
JOHN F. TENBUSCH, an individual

_____                              December 24, 2019
LOUIS J. YOUNG, JR., an individual

THE JOHN F. TENBUSCH REVOCABLE
LIVING TRUST DATED JULY 29, 2014,
AS MAY BE AMENDED

By:     John F. Tenbusch                              December 24, 2019
Its:     Trustee

7

# EXHIBIT 3

## SECOND AMENDMENT TO LOAN AFFIRMATION AND RESTRUCTURE AGREEMENT

This Second Amendment to Loan Affirmation and Restructure Agreement (this "***Second Amendment***") is entered into as of October ___, 2020 ("***Execution Date***"), but effective as of October 1, 2020 (the "***Effective Date***"), by and among LEVEL ONE BANK, a Michigan banking corporation ("***Bank***"), LINEAR MOLD & ENGINEERING, LLC, a Michigan limited liability company ("***Linear Mold***"), LINEAR REALTY, LLC, a Michigan limited liability company ("***Linear Realty***" and together with Linear Mold, each a "***Borrower***" or together, "***Borrowers***"), JOHN F. TENBUSCH, individually ("***Mr. Tenbusch***"), THE JOHN F. TENBUSCH REVOCABLE LIVING TRUST DATED JULY 29, 2014, AS MAY BE AMENDED (the "***Tenbusch Trust***"), and LOUIS J. YOUNG, JR. ("***Mr. Young***", and collectively with Mr. Tenbusch and the Tenbusch Trust, each a "***Guarantor***" or collectively, "***Guarantors***"). Borrowers and Guarantors are each referred to separately as a "***Borrower Party***" and collectively as the "***Borrower Parties***."

### *Recitals and Definitions*

A.  On or about December 31, 2019, but effective as of October 11, 2019, the parties entered into a certain Loan Affirmation and Restructure Agreement (the "***Agreement***"). All capitalized terms not defined in this Second Amendment shall have the same meaning as set forth in the Agreement and/or Amendment, as the case may be.

B.  The Agreement provided for a Forbearance Period (as that term is defined under the Agreement) until April 1, 2020. Effective as of April 1, 2020, the parties entered into an Amendment to the Agreement ("***Amendment***"), which extended the Forbearance Period to October 1, 2020.

C.  Borrower Parties have requested that Bank continue to forbear from taking action with regard to default of the Loans and Bank has agreed to such continued forbearance, subject to the terms and conditions of this Second Amendment.

### *Agreements:*

1.  Forbearance Period.  The Forbearance Period is hereby extended to April 1, 2021.

2.  Fee.  Borrower Parties shall pay to Bank a forbearance fee of Two Thousand and 00/100 Dollars ($2,000.00) upon execution of this Second Amendment.

3.  Acknowledgment of Debt.  Borrower Parties acknowledge that as of September 28, 2020, the current unpaid balance(s) of the Notes (exclusive of costs and expenses) is/are as follows:

| Note | Principal | Interest | Late Charges | Subtotals |
|------|-----------|----------|--------------|-----------|
| 40015225 | $ 1,266,795.65 | $ 4,512.95 | $ 221.12 | $ 1,271,529.72 |
| 40017895 | $ 1,356,987.49 | $ 3,465.87 | $ 820.69 | $ 1,361,274.05 |
| 40018000 | $ 1,319,990.83 | $ 5,692.45 | $ 2,637.87 | $ 1,328,321.15 |
| *Grand Total* | | | | $ 3,961,124.92 |

The amounts referenced above are exclusive of (i) interest accruing after September 28, 2020, (ii) costs and expenses (including, but not limited to, attorney's fees), (iii) SWAP fees, and (iv) other fees provided under the Loan Documents, for which Borrower Parties remain responsible.

4.  Payments on Note 40018000.  Borrower Parties shall cause monthly payments of principal and interest of not less than $11,000.00 per month to be made on Note 40018000. The first such monthly payment shall be due on or before October 1, 2020, and each subsequent monthly payment shall be due on the first day of each month thereafter.

5.  Miscellaneous.

a.      Except as specifically modified or amended by this Second Amendment, the Agreement, Amendment and Loan Documents, and all of the terms, covenants, conditions, and provisions thereof, are hereby ratified and confirmed in their entirety and shall remain in full force and effect.

b.      This Second Amendment may be executed in counterparts, each of which shall constitute an original, but all of which all together constitute one and the same original.

c.      One or more counterparts may be delivered by facsimile, with the intention that they shall have the same effect as an original counterpart thereof.

d.      The Agreement and Amendment is/are hereby restated in its/their entirety as if the same was/were fully set forth herein. In the event of any conflict between the terms of the Loan Documents, the Agreement, the Amendment and this Second Amendment, the same shall be resolved in the following order: the terms of this Second Amendment shall govern, then the terms of the Amendment shall govern, then the terms of the Agreement shall govern, and then the terms of the Loan Documents shall govern.

[*Balance of this page intentionally left blank; signatures appear on following page*]

The parties have executed this Second Amendment as of the date set opposite their respective signatures, the last of which shall be the Execution Date inserted into the opening paragraph of this Second Amendment, but effective for all purposes as of the Effective Date.

**Bank**:

LEVEL ONE BANK,
a Michigan banking corporation

By: _____      October 13, 2020
Jacob D. Hachey
Its:    Vice-President, Managed Assets

**Linear Mold**:

LINEAR MOLD & ENGINEERING, LLC,
a Michigan limited liability company

By: _____      October 8, 2020
Its: _____

LINEAR REALTY, LLC,
a Michigan limited liability company

By: _____      October 8, 2020
Its: _____

**Guarantors**:

_____      October 8, 2020
JOHN F. TENBUSCH, an individual

_____      October 8, 2020
LOUIS J. YOUNG, JR., an individual

THE JOHN F. TENBUSCH REVOCABLE
LIVING TRUST DATED JULY 29, 2014,
AS MAY BE AMENDED

_____      October 8, 2020
By:    John F. Tenbusch
Its:    Trustee

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 21-42617-mar |
| | ) | Chapter 11 |
| **LINEAR MOLD & ENGINEERING,** | ) | Hon. Mark A. Randon |
| **LLC,** | ) | |
| Debtor. | ) | |

_____

## <u>CERTIFICATE OF SERVICE</u>

I, Brigette Melchert, hereby certify that on July 26, 2021, I electronically filed Level One Bank's Objection to Debtor's Plan of Reorganization and this Certificate of Service with the Clerk of the Court using the ECF System which will send notification of such filing to all parties listed by the Court in this case for service via ECF.

Respectfully submitted by,

DAWDA, MANN, MULCAHY & SADLER, PLC

By: _/s/ Brigette Melchert_____
Brigette Melchert
39533 Woodward Avenue, Suite 200
Bloomfield Hills, MI 48304
bmelchert@dmms.com
Dated: July 26, 2021          (248) 642-3700